UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOHN GARDNER, IV, and<br>DAVID GARDNER,<br>    Plaintiffs/Counter Defendants, | : <br> : <br> : <br> : | |
| v. | : | C.A. No. 19-139JJM |
| JAMES R. LARKIN, individually and as<br>the Managing Member of BluShield<br>Window Systems, LLC, and BLUSHIELD<br>WINDOW SYSTEMS, LLC,<br>    Defendants/Third-Party Plaintiffs/<br>    Counter Claimants, | : <br> : <br> : <br> : <br> : <br> : <br> : | |
| v. | : | |
| CUSTOM BUILT WINDOWS<br>MANUFACTURING, LLC,<br>CUSTOM BUILT, INC., and<br>JOHN E. GARDNER, III,<br>    Third-Party Defendants. | : <br> : <br> : <br> : <br> : | |

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

This case arises from a struggle over ownership and control of affiliated business entities – Custom Built, Inc. ("CBI"), and Custom Built Windows Manufacturing, LLC ("CBWM"), ("the Companies") – pitting an outsider from Connecticut (James R. Larkin, "Mr. Larkin") against the Rhode Island Gardner family that had owned and operated the Companies' predecessor for decades and came to regret their decision to open their ranks to an outsider. Since October 2017, Mr. Larkin has been the 50% owner of both Companies. The Gardners[1] own the other 50%. Beginning prior to becoming an owner and continuously until he was fired

---

[1] As used in this report and recommendation, the "Gardners" refers to the three Gardner family members who are the owners of the Companies and the parties in this case (John Gardner, IV, David Gardner and John E. Gardner, III).

and completely frozen out by the Gardners, Mr. Larkin was employed by the Companies and was actively involved in working, particularly to build up CBI's business for the benefit of both CBI and CBWM. Both Companies are now deadlocked.

Currently pending before the Court is Mr. Larkin's emergency motion asking the Court to appoint a temporary receiver *pendente lite* and to enter a preliminary injunction, *inter alia*, reinstating Mr. Larkin as an employee and restoring his salary and health benefits. ECF No. 18 ("the Emergency Motion"). Because of the deadlock, the Companies have been unable to engage legal counsel; therefore, the Court appointed a Special Master to report regarding certain of the matters placed in issue by the Emergency Motion. ECF No. 26. The Special Master's extensive, factually-dense and extremely helpful report was timely filed on June 14, 2019. ECF No. 60. In June and July 2019, an evidentiary hearing was held on the Emergency Motion, following which the parties made post-hearing filings. ECF Nos. 96, 97, 99, 101. On September 27, 2019, a hearing was held at which I advised the parties on the record of my proposed findings. ECF No. 109 (Transcript). During this hearing, I also informed them that, as to certain issues related to the interests of the Companies (particularly the impact on the Companies of Mr. Larkin's reinstatement and the restoration of his salary and of health benefits), the Court needed additional information but also was concerned about the need to forfend irretrievable alterations to the *status quo* during the resulting delay.

To address these matters, on October 31, 2019, the Court issued its Order Appointing Interim Receiver *Pendente Lite* and Adding to Duties of Special Master. ECF No. 114. As relevant to this decision, this order authorizes Theodore Orson, in his capacity as the Special Master, to investigate, make recommendations and advise the Court regarding the impact of reinstating a salary and health benefits for Mr. Larkin in connection with his status as an

employee, shareholder, manager or member of either or both of the Companies; a well-qualified financial consultant was appointed to assist and advise him. Id. ¶¶ 14-15. This order also directed Mr. Orson, in his capacity as Receiver to report to the Court whether the assigned duties need to be expanded, altered, or reduced and to take such other actions consistent with these powers as he deems appropriate to maintain the *status quo* with respect to the matters in issue until final decision on the Emergency Motion. Id. ¶¶ 9, 11.[2] This final report is due in mid-December, following which the parties have the right to respond. Therefore, my report and recommendation on the merits of the Emergency Motion will not issue until late December at the earliest.

On November 20, 2019, the Receiver/Special Master filed an interim report and petitioned[3] the Court for interim instructions. ECF No. 117 (the "Petition"). The parties filed responses, ECF Nos. 119, 120, and the Court held an expedited hearing on November 25, 2019. The Petition brought disturbing new factual information to the attention of the Court: after firing and freezing out Mr. Larkin, the Gardners embarked on a major restructuring of CBI without informing, consulting or conferring with Mr. Larkin, despite his status as the owner of 50% of the CBI's shares and despite the reality that CBI had been built up as a result of Mr. Larkin's efforts.[4] The Petition also advised the Court of the recommendations of the Receiver/Special

---

[2] In this report and recommendation, Mr. Orson is referred to as "Receiver" or "Special Master," depending on the capacity in which he is acting.

[3] The Petition was referred to me for determination. 28 U.S.C. § 636(b)(1)(A).

[4] Through counsel, the Gardeners acknowledged that they had restructured CBI by terminating approximately twenty employees, but argued that it was done for the benefit of CBI and not to manipulate its value for litigation purposes. The Court makes no finding regarding whether the restructuring was done in accordance with the appropriate exercise of business judgment or for a more nefarious purpose. Rather, the focus of the Receiver and of the Court is on the very troubling undisputed reality that, while these proceedings have been ongoing (but before September 27, 2019), the Gardners have continued to act as if Mr. Larkin is not an owner of 50% of the Companies. This conduct evinces a disturbing tone-deafness to the fiduciary obligations that they owe to their equal co-owner and compels the conclusion that a more aggressive intervention is needed to preserve the *status quo* during this period before the Court receives that report of the Special Master and issues its final report and recommendation

Master's financial consultant, endorsed by the report of the Receiver/Special Master, that Mr. Larkin should be provided with health insurance for himself and his family, as well as that, as an owner of the Companies, he should be paid $1000[5] per week. ECF No. 117 ¶ 9. Following a hearing on November 25, 2019, based on presentations of the Receiver and the parties, the Court granted the Petition to the extent that it asked the Court to require that all owners of the Companies and the Receiver/Special Master attend weekly meetings[6] to discuss all material business matters expected to occur during the following week, with Mr. Larkin to be reimbursed for his expenses associated with attending such meetings. ECF No. 121.

As to the Petition's requests that Mr. Larkin should be provided with health insurance for himself and his family, as well as that he should be paid $1000 per week as a co-owner, I deemed these to be in the nature of injunctive relief pursuant to Fed. R. Civ. P. 65, which 28 U.S.C. § 636(b)(1)(B) requires must be addressed in a report and recommendation. Accordingly, I am issuing this report and recommendation for the limited purpose of addressing only the interim issues of health insurance for Mr. Larkin and his family and of prospective payment to Mr. Larkin of $1000 per week. In the nature of a temporary restraining order pursuant to Fed. R. Civ. P. 65(b), the injunction that I urge the Court to impose as quickly as possible is intended to apply during the limited period until the Emergency Motion is decided. The Emergency Motion

---

regarding the Emergency Motion. Accordingly, I am taking the unusual step of issuing this interim report and recommendation.

[5] This amount was recommended by the Receiver/Special Master "somewhat arbitrarily" based on an amount substantially below Mr. Larkin's prior salary and substantially below the salaries of the Gardners, to be split 50-50 between the Companies. See ECF No. 67-1 at 1. In recommending this amount, I relied principally on the time required for meaningful participation in the weekly owner meetings.

[6] The requirement of regular owner meetings was originally proposed by the Gardners. ECF No. 110. They did not object to this aspect of the Receiver's Petition on November 25, 2019. Mr. Larkin also did not object to this proposal.

will remain under advisement until at least the end of the year as the Court awaits the Special Master's report and recommendation (and the parties' responses to it).

I.       APPLICABLE LAW

A trial court confronted with a motion for preliminary injunction must mull four elements: the probability of the movant's success on the merits, the prospect of irreparable harm absent the injunction, the balance of the relevant equities focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does, and the effect of the court's action on the public interest. Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 221 (1st Cir. 2003); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). Where, as here, the court's order is based on a well-developed factual record and the parties have had a full-blown opportunity to be heard, the basic four-factor legal standard is the same for a temporary restraining order and a preliminary injunction. Harris v. Wall, 217 F. Supp. 3d 541, 552 & n.14 (D.R.I. 2016). When the likelihood of success on the merits of a claim of wrongful termination is established, an interim injunction may order reinstatement to address irreparable harm found by the trial court based on an evidentiary proceeding. Rosario-Urdaz, 350 F.3d at 221-22; see, e.g., Stone v. Trump, 280 F. Supp. 3d 747, 768 (D. Md. 2017) (transgender military service members were entitled to preliminary injunction requiring reinstatement pending equal protection challenge to presidential directive); Roig v. P.R. Nat'l Guard, 47 F. Supp. 2d 216, 222 (D.P.R. 1999) (loss of job and stigma of being discharged for person whose salary represents his livelihood causes undue hardship to him and his family and gives rise to irreparable harm that supports interim injunction ordering reinstatement).

The purpose of a preliminary injunction is to preserve the *status quo* until a trial on the merits can be held; it protects the "last uncontested status which preceded the pending controversy." Cohen v. Brown Univ., 809 F. Supp. 978, 999 (D.R.I. 1992) (citation omitted), aff'd, 991 F.2d 888 (1st Cir. 1993). Preliminary injunction rulings are, by definition, premised on a tentative development of the facts, which will be fleshed out as trial approaches. Rosario-Urdaz, 350 F.3d at 223. In cases alleging wrongful termination, the law's "overarching preference is for reinstatement" of the wrongfully terminated employee. Selgas v. Am. Airlines, Inc., 104 F.3d 9, 13 (1st Cir. 1997); see Romero Feliciano v. Torres Gaztambide, 836 F.2d 1, 2-4 (1st Cir. 1987) (when claimant demonstrates likelihood of success on claim of wrongful termination based on exercise of First Amendment right, preliminary injunction appropriate to redress irreparable harm from "loss of his job *per se*," as well as penalty for exercising associational rights).

## II. PROPOSED FINDINGS OF FACT[7] AND CONCLUSIONS OF LAW

Based on the Special Master's report, the testimony and exhibits presented at the hearing held on June 21 and July 1-2, 2019, and for the reasons more fully set forth on the record during the hearing on September 27, 2019, I make the following proposed findings and conclusions:

1.  Mr. Larkin had a reasonable belief, supported by a commonly held understanding with the other owners, that he would have ongoing employment with both of the Companies (despite his performing active work principally for CBI), and that the payment of his salary and health benefits was the "way of splitting up . . . profits," that is, the method by

---

[7] The Court emphasizes that these are a subset of the facts that the Court will include in the report and recommendation that will issue after the Special Master's report has been received in December. I have listed only my proposed findings of fact as necessary to support the limited recommendation that the Court order that Mr. Larkin be paid $1000 per week for attendance at weekly meetings and that his health insurance be reinstated.

6

which owners of the Companies would share the profits of the Companies.  See, e.g., ECF No. 60-2 at 169.

2. CBWM is a limited liability company that employed Mr. Larkin, who is a 50% member and a manager with the right to 25% of the votes at manager meetings.

3. Mr. Larkin's firing by CBWM in November 2018, carried out by the Gardners, was – in form (made without calling a meeting of the managers) and substance (carried out without any examination of whether the supposed justification could be addressed in another way) – a blatant breach of this understanding and in derogation of the fiduciary duty that the Gardners owed to Mr. Larkin as a member/manager of CBWM.

4. Mr. Larkin's firing by CBWM, carried out by the Gardners, was a breach of the duty that the Gardners assumed in signing the CBWM Operating Agreement (§3.03), Ex. 4a, to act in the mutual interests of the members.

5. The Gardners, as controlling managers of CBWM, have engaged in a pattern of wrongful conduct, including refusing to hold mandated meetings and to allow Mr. Larkin access to the books and records, that has had the cumulative effect of freezing out Mr. Larkin, who is a 50% owner of CBWM, and of wrongfully depriving Mr. Larkin of any voice in the operations of CBWM, notwithstanding his status of a manager.

6. CBI is an operating entity that is 50% owned by Mr. Larkin and that employed Mr. Larkin, who actively worked to build it from virtually no revenues to an entity with topline revenues of almost $7 million.  See, e.g., Ex. 46.

7. Mr. Larkin's firing by CBI in March 2019, was carried out by the John Gardner, IV ("Mr. Gardner), acting as the President of CBI.  This decision to freeze out the 50% owner of CBI was made by Mr. Gardner without consulting the shareholders of CBI for a

pretextual reason that was actually and improperly based on what Mr. Gardner believed would be in the interest of the Gardner family and not based on his business judgment regarding the best interest of CBI. This action was a breach of the understanding of the parties in ¶ 1 above and in derogation of the fiduciary duty that Mr. Gardner and the other Gardners owed to Mr. Larkin as a shareholder of CBI.

8. On the same day that Mr. Gardner wrongfully terminated Mr. Larkin's employment at CBI, he also locked Mr. Larkin out of the premises and barred him from access to "corporate information without permission to do so given by me or my authorized representative." Ex. 11. Even limited access to books and records was wrongfully withheld until the Court entered its initial Special Master appointment order and gave the Special Master the task of addressing this issue. See ECF No. 26 ¶ 9.

9. In his capacity as President of CBI, Mr. Gardner engaged in a pattern of conduct, including the refusal to convene shareholder meetings and to allow access to the books and records, that had the effect of freezing Mr. Larkin out of any voice in the operations of CBI, the company he had built.

10. With no salary and no benefits, Mr. Larkin has no way to participate in receiving distributions from the Companies despite his status as an owner of 50% of each.

Based on the recommendation of the Receiver/Special Master, who relies in turn on the recommendation of his financial consultant, as well as the new facts developed during the hearing on November 25, 2019, I make the following additional proposed findings and conclusions:

11. Since wrongly freezing Mr. Larkin out of the Companies, the Gardners have embarked on a major restructuring of CBI without conferring with, consulting or even informing

Mr. Larkin even though this restructuring may have a significant impact on Mr. Larkin's ownership interest in CBI. The Gardners' conduct in restructuring CBI without even advising the owner of 50% of CBI's shares demonstrates that irreparable harm will be inflicted on Mr. Larkin by impairing his rights as an owner until an effective method for including him in discussion of material business matters is imposed by the Court.

12. Without Mr. Larkin's attendance at judicially mandated weekly owner meetings, his ability to participate as an owner/member/manager of the Companies in a meaningful way is being irreparably harmed, particularly because of the irretrievable and potentially adverse impact on his rights pursuant to R.I. Gen. Laws § 7-1.2-1315 (the so-called "buy-out" statute), and on his ability to make appropriate decisions regarding the impact of the buy-out statute on his rights and on the rights of the other owners.

13. Meaningful attendance at weekly business meetings related to material business matters of the Companies will require a significant time commitment for preparation and participation in such meetings.

14. The Companies will not be harmed by the payment to Mr. Larkin of $1000 per week as compensation for his participation in the weekly owner meetings.

15. The Companies will not be harmed by providing Mr. Larkin with health insurance benefits for himself and his family consistent with the health insurance provided by the Companies to all of the other owners.

Based on the foregoing and mindful of the limited period for which this Order will apply (during the period until the Court's final decision on the Emergency Motion), I further find:

16. Mr. Larkin has sustained his burden of demonstrating that he has a substantial likelihood of success in establishing that he was wrongfully terminated from his employment with

the Companies in that he had a reasonable expectation of continued employment as a 50% owner, that the Gardners breached their fiduciary duty to Mr. Larkin when they terminated his employment and, to the extent that the business justification of the Companies' cash flow issues purportedly supported the Gardners' decision to terminate him, the firing was not the least harmful alternative. See Grady v. Grady, No. PB 09-0367, 2012 WL 171006, at *4-9 (R.I. Super. Ct. Jan. 17, 2012 (Silverstein, J.) (holding usual at-will employment principle must give way when employment of owner of closely held company is in issue).

17. Mr. Larkin has sustained his burden of demonstrating that he has been and continues to be at serious risk of irreparable harm because of his inability to procure medical insurance at affordable rates for himself and his family since his salary was cut off by the action of the Gardners. See ECF No. 76 at 61-62. As of November 25, 2019, based on the representation of his counsel, I find that this harm is continuing.

18. As a person who relies on his salary to support his family and who has been stigmatized in the industry where he has worked all his life by the wrongful conduct of the Gardners, Mr. Larkin has also demonstrated that he has been and continues to be at serious risk of irreparable harm because of the impact on himself and his family of the loss of income since his salary was cut off by the wrongful action of the Gardners. See, e.g., id. at 61. I further find that this irreparable harm will be exacerbated if Mr. Larkin is not compensated for diverting his time and attention from other activities for the purpose of preparing for and attending owner meetings of the Companies.

19. I do not find that the part-time position brought to the Court's attention as having been offered to Mr. Larkin by the Gardners (outside sales representative) on October 25, 2019, diminishes the harm to Mr. Larkin that I have described above.[8]

20. To the extent that the public interest is implicated by this Order, I find that it strongly augers in favor of a limited injunction requiring the Companies to compensate Mr. Larkin in connection with his preparation for and attendance at weekly owner meetings and particularly to provide him and his family with health insurance consistent with the health insurance provided to the other owners of the Companies.

21. In light of the recommendation from the Special Master's financial consultant, I now find that the balance of hardships tips in favor of the issuance of an Order that puts Mr. Larkin back on the payroll of the Companies at the rate of $1000 per week to compensate him for attendance at weekly meetings, as well as to restore Mr. Larkin's health insurance for himself and his family.

## III. CONCLUSION

Applying the law to the facts set forth above, I recommend that the Court enter an interim preliminary injunction, in the nature of a temporary restraining order, to remain in effect until the Court issues its decision on the Emergency Motion, ordering the Companies and the Gardners immediately to reinstate Mr. Larkin to the payroll of the Companies by paying him $1000 per week to compensate him in connection with his preparation for and attendance at the weekly owner meetings and immediately to reinstate his family health insurance coverage with coverage comparable to that made available to the other owners of the Companies.

---

[8] The appropriateness of a second job offer made at 2:56 p.m. yesterday is impossible for the Court to assess; this offer may be a good way for Mr. Larkin to reengage with the business and may not. See ECF No. 122-1 at 2. It does not impact my recommendation.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 27, 2019