## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

JOHN GARDNER, IV, and        :
DAVID GARDNER,        :
    Plaintiffs/Counterclaim Defendants,  :
       :
  v.        :    C.A. No. 19-139JJM
       :
JAMES R. LARKIN, individually and as  :
the Managing Member of BluShield   :
Window Systems, LLC,      :
    Defendant/Counterclaim Plaintiff,  :
       :
  v.        :
       :
CUSTOM BUILT WINDOWS     :
MANUFACTURING, LLC,      :
CUSTOM BUILT, INC., and     :
JOHN E. GARDNER, III,      :
    Counterclaim Defendants.    :

### REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Defendant/Counterclaim Plaintiff James R. Larkin is the 50% owner of two Rhode Island entities, a close corporation, Custom Built, Inc. ("CBI"), and a limited liability company, Custom Built Windows Manufacturing, LLC ("CBWM") (collectively, the "Companies"). In 2018 and 2019, he was fired from and frozen out of first CBWM and then CBI (a business he was principally responsible for building) by the owners of the other 50%, John Gardner, IV ("Johnny"), David Gardner and John E. Gardner, III (John Sr.) (collectively, the "Gardners"). This case was launched when two of the Gardners sued Larkin, claiming that he had breached a contract set out in a document titled "Ownership Agreement" that they allege required him to transfer to CBWM ownership of an entity he owned, BluShield Window Systems, LLC ("BluShield"). Larkin met this complaint with a counterclaim alleging, *inter alia*, that the

Gardners had engaged in illegal, oppressive, and fraudulent conduct in breach of their fiduciary, contractual and statutory duties in managing the Companies' finances, in firing him and in denying him access to the books and records and that both CBI and CBWM were deadlocked.[1] Larkin's counterclaim asks the Court to declare that the alleged contract to transfer the BluShield ownership is not a contract at all, as well as to declare the parties' rights pursuant to R.I. Gen. Laws §§ 7-1.2-1314 and 1315, which address the power of a court to liquidate the assets and business of a deadlocked corporation or to avoid dissolution by ordering a share buy-out. While these matters are being resolved, Count II of the counterclaim asks the Court to appoint a temporary receiver *pendente lite* to manage the affairs of CBI and CBWM.

Since May 6, 2019, Larkin's emergency motion for appointment of temporary receiver *pendente lite* and associated preliminary injunctive relief has been pending before the Court. ECF No. 18 (the "Emergency Motion"). Over the months following its filing, the Court has been addressing the issues raised in the motion incrementally, including holding an evidentiary hearing, issuing interim orders appointing a Special Master and Interim Receiver *pendente lite*, and entering an interim preliminary injunction. With the receipt of the Special Master/Receiver's third report, ECF No. 140 ("Report III"), and the parties having been afforded time to object as required by Fed. R. Civ. P. 53(f), I now recommend that the motion for appointment of temporary receiver *pendente lite* be granted and that the requested preliminary injunction should issue.

## I.    PROCEDURAL HISTORY

---

[1] The Gardners recently answered the counterclaim with a two-Count "counter-counterclaim" for themselves and derivatively for CBWM, asserting that Larkin's failure to afford CBWM the opportunity to manufacture and sell the BluShield Window is a usurpation of a corporate opportunity and a breach of Larkin's fiduciary duty. ECF No. 130. Larkin's motion to dismiss these counter-counterclaims is pending. ECF No.138.

On March 21, 2019, Johnny and David Gardner filed their First Amended Complaint (ECF No. 6 ("FAC")) against Larkin and BluShield.[2]  On May 6, 2019, Larkin responded with the Emergency Motion, as well as with his answer to the FAC, and a counterclaim[3] not only against Johnny and David Gardner, but also John Sr. Gardner, CBI and CBWM.[4]  ECF No. 41. Because the parties' deadlock prevented CBI and CBWM from engaging counsel, on May 17, 2019, with the consent of the parties, the Court appointed attorney Theodore Orson, Esq., as Special Master to report regarding the interests of the Companies with respect to the matters placed in issue by the Emergency Motion.  ECF No. 26 at 2-3 ("May 17 Order").  No objection to the May 17 Order was filed, nor was any appeal was taken from it.

The Special Master's report, his first of three, was timely filed on June 14, 2019.  ECF No. 60 ("Report I").  Report I is based on sworn testimony taken by the Special Master from Larkin, Johnny and John Sr. Gardner and two of the Companies' independent financial advisors, as well as on various documents that are authenticated and explained by the testimony.  See ECF No. 60-3 at 19-21.  Next, in June and July 2019, the Court held a three-day evidentiary hearing[5] on the Emergency Motion and received extensive post-hearing filings from the parties. ECF Nos.

---

[2] BluShield was subsequently dismissed from the case.  Gardner v. Larkin, C.A. No. 19-139JJM, 2019 WL 5962682 (D.R.I. Nov. 13, 2019), adopted, Text Order of Dec. 2, 2019 ("Gardner I").

[3] Larkin's initial responsive pleading was filed on May 6, 2019.  ECF No. 17.  Larkin amended his answer and counterclaim on May 27, 2019, making ECF No. 41 the operative pleading, as noted in the text.  The Gardners' motion to dismiss Larkin's counterclaim was denied.  Gardner v. Larkin, C.A. No. 19-139JJM, 2019 WL 5964751 (D.R.I. Nov. 13, 2019), adopted, Text Order of Dec. 2, 2019 ("Gardner II").

[4] Larkin's joinder of CBWM, a limited liability company of which he is a member, did not divest the Court of diversity jurisdiction because 28 U.S.C. § 1367 permits the addition of new, non-diverse parties by a defendant who is not the original plaintiff.  Gardner II, 2019 WL 5964751, at *9.

[5] At the evidentiary hearing, the parties could present their own direct or cross examinations of the witnesses already questioned by the Special Master, as well as call any other witnesses or present any other documents that either side deemed relevant to the Emergency Motion.  See Text Order of Nov. 13, 2019.

76, 92-94,[6] 95, 96, 97, 99, 101.  With the evidentiary record closed, on September 27, 2019, the

Court held a hearing to advise the parties of certain findings and conclusions that would be

proposed in a report and recommendation to follow,[7] but also of the need for further input from

the Special Master, as well as of the need for a limited appointment of a receiver *pendente lite*

while the Emergency Motion remained under advisement.  ECF No. 109 ("Tr. 9/27/19").  After

the parties were afforded time to object and provide input, the Court issued the Order Appointing

Interim Receiver *Pendente Lite* and Adding to Duties of Special Master on October 31, 2019.

ECF No. 114 ("October 31 Order").  No objection to the October 31 Order was filed, nor was

any appeal was taken from it.

Mindful of the financial fragility of the Companies and of the dysfunction that the

evidence establishes had tainted the parties' relationships, the October 31 Order assigned the

Special Master/Receiver additional tasks related to the Emergency Motion's prayer for injunctive

relief.  These included the duty to investigate further and to make recommendations and advise

the Court regarding the impact of reinstating Larkin as an employee of the Companies with a

salary and health benefits in connection with his status as an employee, shareholder, manager or

member of either or both of the Companies; a well-qualified Financial Consultant was appointed

---

[6] Citation to the hearing transcripts are as follows: June 21, 2019 – Tr. 6/21/19; July 1, 2019 – Tr. 7/1/19; July 2, 2019 – Tr. 7/2/19.

[7] To be clear, this report and recommendation is the one "to-be-issued" that was referenced at the September 27 hearing.  See ECF No. 113 at 2-3.  Accordingly, except to the extent adopted by the Court in Gardner III (discussed *infra*), the parties' time to object to these findings pursuant to 28 U.S.C. § 636(b)(1)(B) begins to run now.  I note that one of the challenges for me as a United States Magistrate Judge in managing the District Court's referrals in this case was how to balance the evident need to proceed incrementally, yet expeditiously, so that the Court's intervention would address the crisis, but not do more harm than good, against the duty to respect the decisional framework in 28 U.S.C. § 636.  In light of this challenge, throughout these proceedings, I solicited input from the parties regarding what matters could be determined by me as a magistrate judge and what matters must be reported and recommended for determination by the District Court; neither ever objected to my approach.  E.g., ECF No. 114 at 2 n.3; ECF No. 51 at 18-20.

to assist and advise.  Id. ¶¶ 14-15, 20.  The due date for the Special Master/Receiver's report was set for December 27, 2019.  See id. ¶ 15, amended by Text Order of Dec. 10, 2019.

In addition to extending the Special Mastership pursuant to Fed. R. Civ. P. 53, the October 31 Order appointed Attorney Orson as interim Receiver *pendente lite*, with limited duties to carry through the period while the Emergency Motion remained pending.[8]  October 31 Order at 3.  Most critical to the Court's ultimate determination of the Emergency Motion's prayer for a receiver *pendente lite* was the duty to report whether the assignment needed to be expanded, altered, or reduced from the limited powers set in the October 31 Order and to request further instructions at any time should his "experience reveal[] that sustainable operations for the benefit of all" owners of the Companies would require him to have the authority to actually manage and/or operate the Companies instead of the Gardners.  Id. ¶¶ 10-11.  Otherwise, the October 31 Order left the Gardners in *de facto* control of the Companies subject to further proceedings with the Court's expectation that the parties would conduct themselves consistent with the themes set out during the September 27 hearing, so that an interim preliminary injunction would not be necessary.  Tr. 9/27/19 at 41, 57-58.

The landscape shifted on November 20, 2019, when the Special Master/Receiver filed his second report, ECF No. 117 ("Report II"), and petitioned the Court for interim instructions.  After the parties filed responses, ECF Nos. 119, 120, the Court held an expedited hearing on November 25, 2019.  Report II brought disturbing new factual information to the attention of the Court: after firing and freezing out Larkin, the Gardners had embarked on a major restructuring

---

[8] To address the governance deadlock while the Emergency Motion remained pending, the Court assigned the Special Master/Receiver the power to convene meetings and to cast the "fifth vote" and the power to exercise authority over the Companies' financial officer function, including the power to facilitate appropriate owner access to the books and records.  October 31 Order ¶¶ 4-7, 9.  To mitigate the imminent risk posed by the Third Note, its custody was transferred to the Special Master/Receiver.  Id. ¶ 8.

of CBI without informing, consulting or conferring with Larkin, despite his status as the owner of 50% of CBI's shares and despite the reality that CBI's business had been built largely by Larkin's efforts.  See Gardner v. Larkin, C.A. No. 19-139JJM, 2019 WL 6337686, at *1-2 (D.R.I. Nov. 27, 2019), adopted, 2019 WL 6840732 (D.R.I. Dec. 16, 2019) ("Gardner III"). Report II also advised the Court of the recommendations of the Special Master/Receiver's Financial Consultant, endorsed by the Special Master/Receiver, that, as an owner of the Companies, Larkin should be provided with the same benefits (that is, health insurance) that the Companies provided to the other owners, as well as that he should be paid $1000 per week. Report II ¶ 9.  Following the hearing on November 25, 2019, the Court ordered that all owners of the Companies and the Special Master/Receiver attend weekly business meetings, with Larkin to be reimbursed for expenses associated with attendance.  ECF No. 121 ¶¶ 1-2.  I also recommended that Larkin be provided with health insurance for himself and his family, as well as that he be paid $1000 per week as a co-owner actively participating in the business by attending the weekly meetings; these recommendations were adopted *nunc pro tunc* to November 27, 2019.  Gardner III, 2019 WL 6337686, at *1-2.

The Special Master/Receiver's third report (Report III) was timely filed on December 27, 2019.  As contemplated by the October 31 Order, which permits *ex parte* communications with any party, Report III is grounded in the Special Master/Receiver's communications with the parties and their counsel and the observations he made while attending the parties' weekly business meetings.  Report III at 3.  In addition, it relies on a report from the Special Master/Receiver's well-qualified Financial Consultant, which sets out summary information reflecting the Companies' financial performance prepared by the Gardner side and financial forecasts provided at the Special Master/Receiver's request by the Gardners and Larkin.  Id. ¶ 7;

ECF No. 140-1.  At its essence, Report III is based on the Special Master/Receiver's observations while performing the work assigned by the Court since the May 17 Order and on his extensive experience in performing analogous work over many years; it does not propose new factual findings but rather advises the Court of the Special Master/Receiver's conclusions after two months of working closely with the parties regarding whether the limited intervention in the October 31 Order, as modified by Gardner III, is sufficient to preserve the *status quo ante* and divert irreparable harm.

Report III's core recommendations are that the Court should remove the Gardners from *de facto* control, reinstate Larkin, reset all owner salaries at a uniform rate loosely based on their original agreement as reflected in their dealings prior to November 2018 and expand the scope of the receivership by authorizing the take-over of the management of the Companies through a *pendente lite* appointment of an independent chief executive officer ("CEO") assigned to run them.  Report III ¶¶ 34-62.  Foundational to Report III's recommendations is the Special Master/Receiver's conclusion that the ongoing "tremendous dysfunction" between the Gardners and Larkin is such that "it is not in the best interest of the Companies for the high-level decision-making of the Companies to remain in the hands of the Owners."  Id. ¶ 9.

In response to Report III, Larkin and the Gardners generally object to the Court treating its conclusions as "proposed findings" pursuant to Fed. R. Civ. P. 53(a) because Report III does not rely on newly procured evidence.  ECF Nos. 150, 154.  Both appropriately ask the Court to be mindful of the degree to which, by contrast with Report I, Report III is based on the Special Master/Receiver's observations and experience, as well as on the Financial Consultant's presentation of financial information and forecasts prepared by the Gardners and by Larkin.  ECF Nos. 150 at 7-13; ECF No. 154 at 2-4.  They argue, and I agree, that the findings that

support my recommendations must be based on the evidence. Cobell v. Norton, 237 F. Supp. 2d 71, 82-83 (D.D.C. 2003) (special master may submit report based on his own observations and investigations without formal hearing, but such report is not entitled to presumption of correctness). Nevertheless, I have found Report III to be an extremely important and helpful contribution consistent with the assignment given to the Special Master/Receiver in the October 31 Order. See In re Continental Vending Mach. Corp., 543 F.2d 986, 995 (2d Cir. 1976); Stallworth Timber Co. v. Triad Bldg. Supply, 968 F. Supp. 279, 284 (D.V.I. 1997).

As to the substance of the Report III recommendations, the parties are largely in synch with much of what the Special Master/Receiver proposes. The Gardners' objection reemphasizes their intent to challenge again the Court's finding[9] that the Companies' owners understood that each would be employed and that profits would be distributed through the payment of salaries; they also oppose the Special Master/Receiver's recommendations that Johnny Gardner should not work for CBI and that Larkin's restored salary should be paid *nunc pro tunc* to the date of the issuance of my recommendation. ECF No. 154 at 8-9. Larkin's response essentially endorses all of Report III's recommendations, quibbling only with Report III's failure to propose the establishment of a full-blown "receivership *pendente lite*." ECF No. 150 at 2-7. And he asks the Court to award him back pay, with interest, retroactive all the way

---

[9] This finding was adopted by the Court in Gardner III:

> Mr. Larkin had a reasonable belief, supported by a commonly held understanding with the other owners, that he would have ongoing employment with both of the Companies (despite his performing active work principally for CBI), and that the payment of his salary and health benefits was the "way of splitting up . . . profits," that is, the method by which owners of the Companies would share the profits.

2019 WL 6337686, at *3. The same finding is proposed here, ¶¶ 69-72 *infra*.

back to May 6, 2019, when the Emergency Motion was filed.  Id. at 13-16.  Otherwise, the parties have not objected to Report III's recommendations.

## II.  PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF FACT/LAW

### A.  <u>Findings of Fact</u>

*Background and Early Dealings Between Larkin and Gardners*

1.      From 1961 until 2017, the Gardner family was engaged in the business of manufacturing and selling custom-built windows and related products to building contractors and homeowners through an entity known as Custom Built Windows and Doors Systems, Inc. ("Oldco").  FAC ¶ 8.  Over the decades following its founding by John Gardner, Jr., Oldco provided employment to many Rhode Islanders, some for more than thirty-five years.  Ex. 50.[10] In both manufacturing and selling custom-built windows, the Gardner family business was unique in New England.  As Larkin described it, "it is a great story . . . that we make our [own] product and sell it to homeowners, which is unique."  ECF No. 60-2 at 149.  During the period in issue until October 31, 2017, three sons of the founder (John Sr., Scott and Greg Gardner) and two of his grandsons (John Sr.'s two sons, Johnny and David Gardner) were the shareholders of Oldco.  ECF No. 130 ¶ 11.

2.      By the mid-2000s, Oldco was struggling financially, suffering from two serious problems.  See Report I at 14.  First, its revenues were "trend[ing] downward" and it had experienced four years of book operating losses by the end of 2016.  Id. at 14, 41.  As Larkin described it, Oldco was "[a] family-owned and operated business that through a period of the last ten years was in a slow decline because of conditions in the marketplace."  Id. at 14; see id. at 41 ("Oldco . . . was struggling.").  Second, Oldco's financial controls were persistently weak; for

---

[10] Hearing exhibits such as this one are cited as "Ex. __."

example, it was not collecting data regarding its costs and profits so as to permit a profitability analysis. Id. at 13. At the same time, the second generation of Gardners (Scott, Greg and John Sr.) was nearing retirement. ECF No. 60-2 at 20, 119; Tr. 6/21/19 at 16-17, 153.

3.      In 2016, to expand Oldco's focus on retail marketing and sales, as well as to facilitate a better understanding of profitability, Oldco spun its retail business into a newly formed company, CBI. ECF No. 60-2 at 26-28. CBI was incorporated as a close corporation on October 31, 2016, and began operating on January 1, 2017. Report I at 14; ECF No. 60-2 at 33. However, the Gardners struggled to get CBI off the ground; during the early months of 2017, CBI had almost no employees, no assets, and was doing very little business. Tr. 6/21/19 at 10-11; ECF No. 60-2 at 138-39. It needed a leader with strong experience in retail window sales.

4.      Larkin is a Connecticut resident who has worked for thirty-three years in the window business, particularly in retail sales and window installation, for many of those years as a self-employed entrepreneur. Tr. 6/21/19 at 4-9; ECF No. 60-2 at 122-129. Based on this experience, Larkin has built up an extensive network of industry contacts and friends in the New England region. Tr. 6/21/19 at 33, 149. Larkin's reputation in the window industry is critical to his success and ongoing ability to work. Id.

5.      Larkin is the designer of a proprietary specialty window product known as the "BluShield Window," which is owned by BluShield.[11] Id. at 6. However, in early 2017, the BluShield Window was just a concept – Larkin was actively looking for a business partner to develop a prototype of the BluShield Window that could be produced and marketed. Id.; see ECF No. 60-2 at 84.

---

[11] Until February 2019, Larkin owned 100% of BluShield. Report I at 15-16.

6.     Larkin is an individual with a wife, children and elderly parents, all of whom are dependent on his income for their support.  Tr. 6/21/19 at 15-16, 61 ("I needed to be assured that money was going to be coming in.").  His family is also dependent on him for health insurance. Id. at 98-99.  He has mortgage and car payments, a "life that revolves around making a certain amount of money, which I've made through a number of years."  Id. at 61.  When he eventually went to work for CBI and CBWM, he wrapped up other businesses he owned.  ECF No. 60-2 at 125-26 ("I wanted to focus on putting all of my efforts into Custom Built.").

7.     In February 2017, the Gardners and Larkin were introduced to each other and, in March 2017, began a series of meetings "to explore the opportunity of a partnership" that would bring Larkin into the Gardner orbit to build up CBI and to construct an infrastructure to drive its retail sales, largely of products manufactured by Oldco or its successor, at the same time that the Gardners would continue to oversee administrative matters, including the financial books and records.  See Tr. 7/1/19 at 74-75 & Exs. 1, 49A-C.  Larkin previewed how he would change the Gardners' approach to retail selling and would use his connections across New England (developed during his three decades in the window industry) to recruit staff and increase sales. Tr. 6/21/19 at 32-36, 137-38.  According to Johnny Gardner, Larkin "had a great deal of experience running retail operations, which was going to be a new focus for us."  ECF No. 60-2 at 28.  For his part, Larkin saw a "huge opportunity" in Oldco's failure to understand its profitability and its weak financial controls, and that, if these deficiencies in the Gardners' management could be improved, he could "grow the revenues."  Report I at 14-15.

8.     The parties also discussed the possibility of a "partnership" with BluShield, allowing the BluShield Window to be manufactured by a Gardner family entity pursuant to a "Lic. Agreement," following which Larkin would "negotiate % ownership in [Oldco] for BSW

asset." Ex. 49C at 4; ECF No. 60-2 at 28, 149-50. As described by Johnny Gardner, "Mr. Larkin brought in a window design that he was trying to find a manufacturer to partner with to build it. We had a mutual attraction to that. We liked the overall idea behind it and thought it would be a great way to basically direct the next 20 years of the business." Report I at 16.

9.      These early discussions reveal that the parties had and would continue to have starkly contrasting business approaches. As described by Johnny Gardner, "[s]o we had taken a very farming approach. . . . [s]o it is very much like you plant seeds and at some point in the future you hope to harvest that becomes business[, while] Mr. Larkin's approach was very much a hunter." Tr. 7/1/19 at 67; see Report I at 17 (describing substantially different approaches).[12]

   *Larkin's Early Success with CBI*

10.     By the end of March 2017, Larkin agreed to work for CBI for a "prove-it" period, during which he would be paid a modest salary with the oral understanding that he would become an owner of CBI if he was able to bring in $1 million in sales. FAC ¶ 13; ECF No. 41 ¶ 13; Tr. 6/21/19 at 8-10. Larkin threw himself into the effort of building CBI, and by May 2017, he had hit the mark. Tr. 6/21/19 at 10. On May 24, 2017, he was issued 33.5% of CBI's stock; his CBI salary was substantially increased to $2000 per week and he began to receive a significant salary from Oldco; he also began to receive health benefits. Report I at 40; ECF No. 60-2 at 39-40. Johnny Gardner believed that Larkin was "getting off the ground and starting to grow that presence, revenue, customer base, [and] profitability." ECF No. 60-2 at 45. During this period, Larkin opened new offices for CBI. Tr. 7/1/19 at 80. By the end of 2017, under Larkin's leadership, CBI's top-line revenues exploded from *de minimis* to $2 million. Ex. 52.

---

[12] The parties vigorously object to the Special Master/Receiver's summary of their profoundly different business philosophies in Report III. See, e.g., ECF No. 150 at 8; ECF No. 154 at 5-6. I propose this finding based on the cited evidence – not on Report III.

*Larkin/Gardner Negotiations During May to August 2017*

11.      In late May 2017, Larkin and the Gardners continued discussions of options for their business alliance. Tr. 6/21/19 at 13-15. These options contemplated that Larkin would become an owner of 50% or more of CBI, and potentially an owner of a percentage of Oldco, based on which Larkin would be paid a specified salary (ranging between $100,000 and $150,000 per entity) and would serve in a key leadership position focused on business development, while Johnny Gardner would handle administration. Ex. 1. Some of the options discussed involved the transfer or sale of a minority share in BluShield to Oldco. Id. For example, Larkin proposed that Oldco would pay him $500,000 for a 25% stake in BluShield. Id.

12.      In testimony that I find credible, Larkin was consistently clear to the Gardners from the earliest phase of the parties' discussions of a possible relationship that brought Larkin in as an owner of the Companies that employment and a salary in the range being discussed ($100,000 or more paid by each entity) was critical to him and his family. Tr. 6/21/19 at 15-16 ("I needed to have a salary. I needed to make money every week."). In response, the Gardners did not advise Larkin that they rejected or disagreed with this concept. They never advised him (until they fired him) that his employment would be at-will or that he could be fired on a whim by the Gardner family. Id. at 21-22; Tr. 7/1/19 at 112. Instead, they continued the parties' negotiations, which consistently linked ownership to employment with specific salaries, ultimately landing on an arrangement by which Larkin owned 50% but was paid somewhat less than 50% (between 40-48%) of the total of the salaries paid to all four owners. ECF No. 67-1.

13.      The negotiations continued through the summer of 2017. Johnny Gardner and Larkin agreed to the principle of equal ownership (50% Larkin and 50% Gardners) in whatever the business would be. Tr. 6/21/19 at 17. They agreed that, for CBI, "Mr. Larkin and [Johnny]

would be on the same level." Tr. 7/1/19 at 112. And Larkin came to understand that "estate

planning" was one of the goals of the Gardners in that "the senior Gardners would be retiring and

younger Gardners would be taking over." Tr. 6/21/19 at 16-17.

*The "Ownership Agreement"*[13]

14.     In August 2017, the discussions crystalized into an outline written by Larkin titled

"Ownership Agreement." Ex. 2; Tr. 6/21/19 at 18-22. Larkin prepared this document to reflect

"the evolution of discussions that we were having," capturing what he, Johnny and David

Gardner had agreed to as of that point. Tr. 6/21/19 at 18-19. The "Ownership Agreement" is

signed by Larkin, but only by the "younger Gardners," Johnny and David Gardner. Ex. 2; see

Tr. 6/21/19 at 16. The "Ownership Agreement's" foundational concept is that Oldco's assets and

BluShield's assets, being of approximately equal value, would be merged in a new entity without

any payment to Oldco's shareholders or to BluShield's member, Larkin. Tr. 6/21/19 at 18-21,

109-10. The "Ownership Agreement" is not signed by the owners of 60% of Oldco's shares

(John Sr., Scott and Greg Gardner), nor is there any evidence that Johnny and David Gardner

signed on behalf of Oldco or that Oldco agreed to the concept.

15.     According to the "Ownership Agreement," Oldco would be replaced by the new

entity holding the assets of Oldco and BluShield, while CBI would continue as the retail sales

entity. Ex. 2. Larkin's ownership share of CBI would increase from 33.5% to 50%, with the

other 50% allocated among John Sr., Johnny and David Gardner. Ex. 2. Larkin would also own

50% of the Oldco successor entity, with Gardners owning the other half.

---

[13] The reader is reminded that the "Ownership Agreement" is the foundational document for the breach of contract claim based on which Johnny and David Gardner initiated this case. FAC ¶¶ 14-27. Counts I and II of the FAC are premised on the allegation that Larkin promised to transfer BluShield to Oldco's successor. See Gardner I, 2019 WL 5962682, at *1.

16.     While he signed it, Johnny Gardner understood that the "Ownership Agreement" was not the final legal draft, nor was it the complete expression of the parties' agreement.  Tr. 6/21/19 at 159, 161.  Regarding the essence of the arrangement it describes, Johnny testified: "I would not have gone that route."  ECF No. 60-2 at 83.  Nor did Johnny ever have any discussion "in any length" with Larkin regarding the structure that he "would have pushed for."  Id. at 86.  Similarly, Larkin understood that the "Ownership Agreement" was "[a]bsolutely not" the complete and final expression of the parties' agreement.  Tr. 6/21/19 at 19, 107.

17.     The "Ownership Agreement" not only sets specific ownership percentages, but also links specific salaries to them.  According to the "Ownership Agreement," Larkin would be paid $125,000 by CBI and the new entity (a total of $250,000), while Johnny Gardner would be paid $100,000 by CBI and David Gardner would be paid $100,000 by the new entity.  Ex. 2.  The "Ownership Agreement" does not address the salary of the fourth owner, John Sr.  Id.

*Post-"Ownership Agreement" Negotiations*

18.     After the "Ownership Agreement" was signed, Larkin and the Gardners continued talking, but the focus shifted to succession: which Gardners would retire and how the interests of two of the older Gardners (Scott and Greg) would be bought out.  ECF No. 60-2 at 149-52.  The parties came to conceive of a transaction that abandoned the "Ownership Agreement's" foundational concept – a merger of two entities of roughly equal value – but rather was an acquisition by a to-be-created manufacturing company (CBWM) of Oldco's assets for $1.8 million, to be paid through two notes.  Tr. 6/21/19 at 22-23; ECF No. 60-2 at 49-52.  A transfer of ownership of BluShield was no longer part of the transaction.  ECF No. 60-2 at 150-52.

19.     In September 2017, the Gardners engaged their attorney of "many, many years," Andrew Davis, Esq., to prepare final documents reflecting the parties' agreement, to be executed

at a closing held on October 31, 2017 ("October 2017 closing"). Ex. 54 at 11-12, 16, 18, 31. Attorney Davis had one meeting with Gardner family members and Larkin on September 17, 2017. Id. at 20. Otherwise, he relied on Johnny and John Sr. Gardner, reviewed the documents with Johnny Gardner in detail, but did not go over them at all with Larkin. Id. at 31.

20.     Johnny Gardner never told Attorney Davis that BluShield was part of the arrangement to be reflected in the final documents. Id. at 36-37. If Johnny Gardner (or any Gardner) had told him that the Gardners expected or believed that CBWM was to receive an ownership interest in BluShield, Attorney Davis would have memorialized that as part of the transaction. Id. at 38. Rather, based on his discussions with Johnny and John Sr. Gardner, Attorney Davis understood that Larkin's consideration for ownership of CBI and CBWM was his "strong sales ability, and you know, the hope was that these companies would do great, and he would benefit to the tune of, you know, his 50% ownership." Id. at 66. Consistent with instructions from the Gardners, the Davis documents do not mention BluShield at all.

*The Third Note*

21.     In the weeks preceding the October 2017 closing, Larkin understood that the transaction had become a buy-out of the assets of Oldco by a newly formed entity – CBWM – in consideration for the purchase price of $1.8 million. Tr. 6/21/19 at 17, 23. He also understood that he would own 50% and be paid a salary but would not be an employee-at-will. Id. at 21.

22.     After Attorney Davis was advised that the purchase price was $1.8 million, he prepared drafts that included $1.8 million as the purchase price. Ex. 30 ¶ 3.1; Ex. 31 ¶ 3.1. However, as the closing approached, he became concerned about the tax implications of two of Oldco's owners being paid by secured notes totaling $1.8 million, while John Sr. Gardner got no compensation. Ex. 54 at 24. In testimony that I do not find credible, Attorney Davis claims he

and the accountants devised a solution – to increase the purchase price by having the new entity sign a Third Note, raising the purchase price from $1.8 million to $2.7 million to avoid the appearance "that John Sr. was going to make a gift to Jim Larkin." Id. Therefore, he prepared the Third Note, a promissory note owed by CBWM to Oldco in the amount of $900,000, for execution at the closing. See Ex. 8C. Davis claims that he mentioned the Third Note at the only meeting he had with Larkin (on September 17, 2017), but admits that he deleted an advisement from the draft of the Agreement of Purchase and Sale of Assets that "the parties have been advised by Mr. Davis that this agreement may have tax consequences." Compare Ex. 5 ¶ 13.11, with Ex. 31 ¶ 13.11. I find credible Larkin's testimony that he was unaware of this profound change in the terms of the transaction until he arrived at the closing on October 31, 2017.

23. Attorney Davis, Larkin, Johnny, John Sr., David, Scott and Greg Gardner all attended the October 2017 closing. Ex. 54 at 13. Larkin understood that Attorney Davis was representing all of the individuals present, including himself. Tr. 6/21/19 at 27. In one of the documents executed at the closing (the Agreement of Purchase and Sale of Assets, Ex. 5), all present initialed an advisement that: "(1) the parties have been advised by Mr. Davis that a conflict exists among their individual interests; and (2) the parties have been advised by Mr. Davis to seek the advice of independent counsel; and (3) the parties have had the opportunity to seek the advice of independent counsel." Ex. 5 ¶ 13.11.[14]

24. At the closing, Larkin was "[v]ery much" surprised to be asked to sign three notes of $900,000 each, owed by CBWM to Oldco, totaling $2.7 million, far more than the discussed

---

[14] Ethically troublesome is Attorney Davis' later (in January/February 2019) representation of the Gardners in their negotiations with Larkin regarding BluShield and the parties' other disputes. Ex. 54 at 51-52. Attorney Davis testified that, during that later time, he was unambiguously representing the Gardners and that he told Larkin he was not acting as his attorney; he claimed he tried to limit his role to that of "intermediary." Id.

purchase price of $1.8 million.  Tr. 6/21/19 at 24-25; ECF No. 60-2 at 154 ("[I]t was supposed to be $1.8 million . . .  At the last minute, it became a third note of $900,000 to John Senior, which was an issue for me because I didn't know about it until we were signing paperwork."). Attorney Davis confirmed that Larkin "wanted to understand the reason for the third note again. So we went through it again."  Ex. 54 at 23.

25.     At the closing, one of the Gardners promised Larkin that the Third Note was never going to have to be paid.  <u>See</u> Tr. 6/21/19 at 26 ("That [he] didn't have to be worried about it because it was never going to have to be paid"); <u>id.</u> at 173 (when asked, "did somebody say something to Mr. Larkin that he needed to sign the note but the note wasn't going to be enforced?," Johnny Gardner answered, "I believe so").  In reliance on this promise, Larkin executed the Third Note on behalf of CBWM.  <u>Id.</u> at 26.

26.     According to its terms, the Third Note required monthly payments of $4545.24 beginning on December 1, 2017, until paid in full.  Ex. 8C.  If not paid, at the option of Oldco or the assignees to whom the Third Note might be transferred, "all principal and interest . . . shall become immediately due and payable."  <u>Id.</u> at 1.  The Third Note is secured by all of the real estate, assets, leases and rentals conveyed by Oldco to CBWM.  Ex. 9C.

27.     John Sr. Gardner testified that the Third Note has been assigned to him and to his two sons, Johnny and David Gardner, and that he had an understanding among himself and his two sons (but not with Larkin or CBWM) that the Third Note was not going to be enforced.  Tr. 7/1/19 at 40.  John Sr. also testified that, as of July 2019, none of the payments required by the Third Note have been made, so it is in default, but it has not been enforced.  <u>Id.</u>

28.     Inconsistent with an agreement that the Third Note is not enforceable, John Sr. Gardner averred that his "personal tax returns for the calendar year 2017 were consistent with the

third note, Note C, being valid and enforceable," as well as that the tax return "was not consistent with an unwritten agreement between my sons, David and John Gardner, IV, not to enforce the third note." ECF No. 95 at 2-3. Contrary to his testimony, his attorney's objection asserts that John Sr. Gardner does not admit "that there [was] a binding enforceable agreement amongst the Gardners (John, III, David and John, IV) not to enforce" the Third Note. Id. at 2.

29.     Inconsistent with the promise made to Larkin, who acted on behalf of CBWM when he signed the Third Note, CBWM, whose books are controlled by the Gardners, carries the obligation of the Third Note as part of its long-term debt. ECF No. 60-12 at 2.

*CBI Documents Executed at the October 2017 closing*

30.     At the October 2017 closing, the parties executed an Amended Stockholders' Agreement for CBI confirming that it was owned as follows:

| Larkin: | 50% |
| Johnny Gardner: | 22.5% |
| David Gardner: | 22.5% |
| John Sr. Gardner: | 5% |

Ex. 3 at 21. The Gardners agreed to issue to Larkin 50% of the shares of CBI to make him an equal owner to continue to drive retail sales principally of products manufactured by CBWM.

31.     As a close corporation, the CBI Bylaws (Ex. 14) dispense with a board of directors, vesting the president with the powers normally vested in a board and assigning him the duty to have general and active executive management of CBI's operations. Ex. 14 Art. III, Art. IV § 5. The Bylaws provide for the election by the shareholders of a president, secretary and treasurer, who may be the same person. Id. Art. IV § 1. At the October 2017 closing, CBI held a meeting to elect officers and adopted Bylaws. Exs. 3, 14; ECF No. 60-16, 60-17. Johnny Gardner was elected to serve as president, secretary and treasurer. ECF No. 60-17.

32. Regarding meetings, the CBI Bylaws require that "[t]he annual meeting of the shareholders shall be held in each year, for the purpose of electing officers" and that special meetings of shareholders must be called if requested by the holders of 10% or more of the outstanding shares. Ex. 14 Art. II § 1-2. A majority of the outstanding shares is a quorum. Id. Art. II § 8. Once elected, an officer serves until his successor is elected or until he can no longer serve. Id. Art IV § 2. The fixing of the salaries of the officers and the decision to pay dividends are required to be made "from time to time" by the shareholders. Id. Art. IV § 8, Art. X.

33. Section 3 of Article IV of the CBI Bylaws addresses the removal of officers and "agents," which may be done only by "the shareholders whenever in their judgment the best interests of the Corporation would be served thereby." Id. Art IV § 3. This provision is ambiguous in that there is no definition of "agent." I find that a fact finder would interpret this provision to mean that Larkin was an "agent" of CBI whose removal could only be done "by the shareholders" based on their judgment regarding the best interest of CBI.

34. At the October 2017 closing, Larkin and the Gardners also signed CBI's Amended Stockholders' Agreement. Ex. 3. It reflects the shareholders' belief "that they will be able to deal easily and comfortably with each other and that it is in their best interests and in Custom Built's best interests that all corporate activities be controlled by persons who deal comfortably with each other." Ex. 3 at 1 ¶ D.

35. CBI's Amended Stockholders' Agreement expressly supersedes any prior agreements "with respect to [its] subject matter." Id. Art. 15, § 15.1.

36. CBI's Amended Stockholders' Agreement calls for the application of Rhode Island law. Id. Art. 15 § 15.2.

37.     None of CBI's formative documents (Articles of Incorporation, Bylaws, and Amended Stockholders' Agreement) contain any provision providing for dissolution by a shareholder at will or upon the occurrence of a specified contingency as permitted for a close corporation by R.I. Gen. Laws § 7-1.2-1701(a).  See Exs. 3, 14; Custom Built, Inc. Articles of Incorporation, R.I. Secretary of State (Filing No. 201611465710).

*CBWM Documents Executed at the October 2017 closing*

38.     Created pursuant to R.I. Gen. Laws § 7-16-5 on September 13, 2017, CBWM is a Rhode Island limited liability company.  Ex. 4A (Operating Agreement); Ex. 15.  At the October 2017, closing, Oldco transferred all of its assets to CBWM in consideration for three notes (including the Third Note) for a total of $2.7 million, securitized by three mortgages/security agreements.  Exs. 8A-C, 9A-C.  As a limited liability company, CBWM is owned by its members with its profits and losses to be allocated as follows:

| | |
|---|---|
| Larkin: | 50% |
| David Gardner: | 27% |
| Johnny Gardner: | 18% |
| John Sr. Gardner: | 5% |

Ex. 4A, Schedule B, Art. V § 5.04; see R.I. Gen. Laws § 7-16-26.  The Gardners' agreement to make Larkin a 50% member of CBWM was primarily to bring him into both Companies as a 50% owner to drive retail sales of CBWM products through the buildup of CBI.  They also acted based on the intent of the parties to negotiate an acceptable arrangement with respect to BluShield and to build a dealer network to handle its sales.

39.     CBWM's Operating Agreement vests the power to carry on the business and affairs of CBWM in its managers.  Ex. 4A Art II § 2.01.  The Operating Agreement names all four of the members (Larkin, Johnny, David and John Sr. Gardner) as the "Initial Managers" and provides that, if any of the Initial Managers are unable to serve, a "successor Manager" must

be elected for a one-year term by the members.  Id. Art. 2 § 2.02.  The Operating Agreement is ambiguous regarding whether it should be interpreted as restricting the "Initial Managers" to the same one-year term as is set for successor Managers.  See Report I at 48-49.  I find that a fact finder would interpret this ambiguous provision as requiring the election of successor Managers at the annual meeting next following the appointment of the Initial Managers.

40.　　According to the Operating Agreement, the managers of CBWM are obliged to "keep just and true books of account . . . [to which] all members . . . shall at all reasonable times have access," and that managers must prepare annual financial reports which must be furnished to each member.  Ex. 4A Art. IV §§ 4.01, 4.03.

41.　　The Operating Agreement provides that CBWM's managers act by majority vote with each manager entitled to one vote.  Id. Art III § 3.01(a).  Managers are required to meet regularly, "as [they] . . . from time to time . . . determine."  Id. Art. II § 2.05.  Each manager is required to "devote such time and effort to the LLC business as it deems necessary to promote adequately the interests of the LLC and the mutual interests of the members."  Id. Art. III § 3.03.

42.　　The CBWM Operating Agreement expressly permits its managers to own other business ventures.  Id.  Therefore, Larkin's ongoing ownership of BluShield did not breach any duty owed by Larkin to CBWM, its members or its managers.

43.　　Regarding meetings, CBWM's members must hold an annual meeting during September each year.  Id. Art. II § 2.04.  One of the mandatory purposes of this annual meeting is "for the election of successor Managers."  Id.

44.　　CBWM's Operating Agreement recites that it "constitutes the full and complete agreement of the parties hereto with respect to the subject matter hereof."  Id. Art. X § 10.06.

45.     CBWM's Operating Agreement calls for the application of Rhode Island law.  Id. Art. X, § 10.09.

*Larkin/Gardner Post-Closing Business Dealings*

46.     After the October 2017 closing, into the fall of 2018, Larkin continued working successfully on a full-time basis to amplify the retail business of CBI, including the hiring of key new employees, the opening of new offices and the acquisition of a window company in New York.  Tr. 7/2/19 at 32-33, 83-85.  Although CBI was formed before Larkin became an owner, the significance of his efforts in building its business makes him a virtual founder.

47.     Because a substantial percentage of the products sold at retail by CBI were manufactured by CBWM, CBWM benefited from the CBI retail sales growth created by Larkin. ECF No. 60-2 at 22 ("overwhelming majority" of CBI products sold are manufactured by CBWM); Report I at 42 (approximately 20-23% of CBWM's sales are to CBI).  Due to Larkin's efforts, the leveraging of his sales skills, his ability to forge a new sales strategy and his industry contacts, the consolidated total revenues of CBI and CBWM grew to approximately $10.4 million by the end of 2018, more than doubling what Oldco's sales had been in 2015.  ECF No. 60-10.

48.     After the October 2017 closing through the fall of 2018, Larkin was working with Scott Gardner, on behalf of CBWM, to develop the manufacturing capability to bring the BluShield Window from prototype to production and to market, which Scott Gardner estimated "was going to take a while," potentially "a year" or longer.  Tr. 7/1/19 at 72-73.  The ability to manufacture pursuant to the BluShield design was a preliminary task that had to be completed before CBWM could produce it for sale or develop a dealer network to purchase it.  Id.; see Exs. 49A-C.  In addition to the efforts of Larkin and Scott Gardner, CBWM had invested $250,000,

which included new manufacturing equipment, for the purpose of developing a manufacturing prototype for the BluShield Window.  Tr. 7/1/19 at 10.

49.     Also after the October 2017 closing through the fall of 2018, with no meeting of the minds and no agreement regarding the terms on which CBWM would be legally able to manufacture and sell the BluShield Window, Larkin continued to own BluShield separately from his ownership of CBWM as permitted by the CBWM Operating Agreement (Ex. 4A Art III § 3.03).  During this period, the Gardners made no effort to continue the negotiations regarding a BluShield license agreement or membership transfer that would legally entitle CBWM to proceed with manufacturing or selling the BluShield Window.  In testimony that I do not find credible, Johnny Gardner explained that this delay was based on his belief that Larkin had promised that 50% "of BluShield [ ] would be, in some final form, transferred to us, meaning the Gardners."  ECF No. 60-2 at 64.  More credible is Johnny Gardner testimony that the Gardners dropped the ball: "We got busy.  At a certain point, we trusted Jim would complete the deal.  We let it sit and there was not really a rush to get the deal done."  Id.

50.     As 2018 proceeded and CBI's top-line grew, its costs and expenses spiraled up and it was unable to transfer cash to CBWM to net out intercompany transfers.  See Tr. 7/1/19 at 10; Tr. 7/2/19 at 93-95.  As a result, CBWM was owed a growing and "substantial receivable" by CBI and the Gardners were becoming fearful that they were not making any money; this anxiety exacerbated strained relationships among Larkin and John Sr. and David Gardner, who regretted their agreement to make Larkin an employee with a salary paid by CBWM.  Tr. 7/1/19 at 10-11; Report I at 45, n.21.  Also throughout this period, as with Oldco, the financial controls for both CBI and CBWM continued to be a serious problem.  The Companies were unable to close their books at the end of regular accounting periods and reliable financial information, from which the

owners could make sound judgments regarding how to address the cash flow problem, continued to be unavailable. Tr. 7/2/19 at 83, 111, 114-15. It was Johnny Gardner, as CBI's president, secretary and treasurer, and as CBWM's point of contact for the accounting advisers, who was responsible for the maintenance of the books and records, the establishment and implementation of financial controls and the administrative infrastructure of both Companies. Tr. 7/2/19 at 80, 107, 114-15; ECF No. 60-3 at 27, 35-36, see Ex. 1; Ex. 49C. Nevertheless, the Gardners blamed Larkin for growing CBI's sales but not keeping costs in line. ECF No. 60-2 at 61, 66-68. This blaming was misplaced because financial controls and administration at CBI were Johnny Gardner's responsibility and was premature because it was too soon to know whether, given time, CBI would have built the infrastructure necessary for sustainable profitability.

*Unilateral Gardner Decision to Fire Larkin from CBWM*

51.     In late September and October 2018, the three Gardners met and discussed what to do about CBWM's cash flow problem. Tr. 7/1/19 at 11-12. Larkin was totally excluded from these discussions and the meetings at which they occurred. Tr. 6/21/19 at 38-39; Tr. 7/1/19 at 11-12. While consideration was given to cutting the salaries of all owners, instead of cutting their own salaries, the three Gardners decided to address the problem by reducing CBWM's costs by firing Larkin from CBWM and cutting off his CBWM salary. Tr. 7/1/19 at 11-12. There was no discussion of the impact of this decision on CBWM's inchoate relationship with BluShield; nor was there any discussion of CBWM's and CBI's underlying issues with inadequate financial controls (such as the possibility of bringing in a non-Gardner financial officer). I do not find credible Johnny Gardner's testimony that the reason for this decision was "Job performance. Failure to perform his duties."[15] ECF No. 60-2 at 87. Nor do I find credible

---

[15] The Gardners offered Johnny Gardner's testimony and Exhibit 24 as evidence that Larkin was fired by CBWM because he failed to bring in enough "dealer" business. Tr. 7/1/19 at 93-97; Ex. 24. I do not credit this proffer; the

Johnny Gardner's after-the-fact email written on March 22, 2019, the day after this case was filed: "[a] weekly salary from a company is payment for services rendered. . . . [Y]ou hadn't been performing your job as 'business developer' in acquiring profitable accounts for the manufacturer. That is why your salary was terminated." Ex. 26E.

52. I further find that at least part of the real reason for the Gardners' abrupt decision to fire Larkin from CBWM lies in the cultural clash between the Gardners' business approach as "farm[ers]," and Larkin's assertiveness as a "hunter." See ¶ 9 *supra*. The Gardners found Larkin's approach to be profoundly unsettling, even though Larkin's ability aggressively to sell was the reason they originally brought him in. I also find that the Gardners were animated by their mistaken belief that their ultimate duty was owed not to CBWM or its members, but to the Gardner family. See ECF No. 60-2 at 110.

53. The decision was implemented in November 2018. See ECF No. 41 ¶ 57. David Gardner was given the task of telling Larkin that he was being unceremoniously fired, which he did by a phone call during which he told Larkin that the Gardners had decided "to take [his] salary to help pay the bills." Tr. 6/21/19 at 38. Larkin was stunned, said, "no thank you," and hung up. Id.; Tr. 7/1/19 at 12. I find that this ham-handed action by the Gardners "really soured" the relationship between Larkin and the Gardners. Tr. 7/1/19 at 12. Larkin began to have serious doubts about his ability to negotiate an acceptable arrangement for the BluShield Window to be made by CBWM. Sometime later (most likely in November or December 2018), when Scott Gardner called to continue progress on the BluShield Window prototype, Larkin told

_____

substantial evidence establishes that Larkin's role was to build the retail company (CBI), to work with CBWM on the possibility that it might become the manufacturer of the BluShield Window and, in anticipation of success with the latter endeavor, to build a dealer network to support such sales. There is no evidence apart from Johnny Garnder's *ipse dixit*, which I find to be an after-the-fact concoction, that CBWM set separate dealer sales targets for Larkin and that he could and would be unceremoniously fired for failing to meet them.

him, "that I had been terminated from the manufacturing company and that as far as I was concerned all things BluShield windows was going to come on hold." Tr. 6/21/19 at 40; see Tr. 7/2/19 Vol. II at 45.

54.     Johnny Gardner testified that this was the first time that he realized that the October 2017 closing documents had not addressed BluShield: "We found out, it took us a year to find out, that the balance of that transaction of the BluShield part was never completed." ECF No. 60-2 at 60-62. I do not credit this testimony to the extent that it is based on an assumption that the parties had reached agreement, or that Johnny Gardner believed that the parties had reached an agreement, regarding the transfer of an interest in BluShield to the Gardners or to CBWM.

*BluShield Negotiations Resume*

55.     Finally, in December 2018, for the first time since discussions broke off in August 2017, the parties began to negotiate in earnest about the BluShield Window. These discussions also focused on the Gardners' concerns over CBWM's cash flow problems caused by CBI's failure to pay its intercompany "debt" to CBWM. Tr. 6/21/19 at 41-46; Ex. 38. During January and February 2019, these discussions continued; Larkin and the Gardners met and exchanged many emails, some biting in tone, regarding the terms on which Larkin would agree to proceed with the manufacturing of the BluShield Window by CBWM. During these negotiations, the Gardners proposed giving Larkin control of CBI by issuing additional shares, while he would convey a minority ownership interest in BluShield to the Gardners; Larkin countered with the proposal that he would give up his ownership in CBWM in exchange for 100% ownership of CBI, with a contractual buy-sell relationship (including a BluShield license) with CBWM. See Exs. 38, 53. The parties were unable to reach agreement. Tr. 6/21/19 at 47.

56.     In February 2019, Larkin met with his senior team at CBI to advise them of arrangements then contemplated by these negotiations, including the possibility of a partial or complete separation of CBI from CBWM and the Gardners.  Tr. 6/21/19 at 46-47, 126-27.  One of these employees recalled that Larkin's distrust of the Gardners had soured to the point where this meeting was held at a mall in case the office had been bugged.  Tr. 7/2/19 Vol. II at 57, 79.  Based on these discussions and the toxicity of the relationship between Larkin and the Gardners, I find that these employees felt caught in the middle and that CBI's business was being adversely affected.  Tr. 7/2/19 Vol. II at 55, 74, 91-92; e.g., Ex. 27 at 1 (Beth Thomas: "I am trying to stay neutral but it is getting weird.").  However, I reject the Gardners' characterization of Larkin's meeting with the senior CBI team as an attempt to breach his fiduciary duty to them or to CBI.

*Johnny Gardner Decides to Fire Larkin and Lock Him Out of CBI*

57.     During the same period (February 2019), without any meeting of CBI's shareholders as required by § 3 in Article IV of CBI's Bylaws (¶ 33 *supra*), Johnny Gardner decided to fire Larkin from CBI and cut him completely out of both Companies; he began to consult with legal counsel about this decision.  Tr. 7/1/19 at 16-17.  Contradicting his own testimony that he knew that he and Larkin were "on the same level" at CBI, id. at 112, Johnny Gardner claimed (not credibly) that his unilateral decision to terminate Larkin from CBI was based on Larkin's "insubordination": "[Larkin] doesn't strike me as the kind of person who would play second fiddle, certainly to me."  Id. at 16-17; Tr. 7/2/19 at 17.

58.     Johnny Gardner's decision to fire Larkin from CBI was not implemented for another month.[16]  Tr. 7/2/19 Vol. I at 47.  The moment chosen was triggered by Larkin's request

---

[16] Emails sent by Johnny Gardner to Larkin during the period between the decision to terminate and its implementation appear to have been written to build a justification for the decision.  See, e.g., Ex. 26A-E.  As a result, the Court has not relied on them.

for access to CBWM's financial records on March 20, 2019. On the next day, March 21, Johnny and David Gardner filed this case, on March 25, 2019, the complaint was served and on March 26, 2019, Johnny Gardner, acting in his capacity as President of CBI, fired Larkin by letter, "effective immediately," barring him from entering CBI's premises or from accessing any of its "corporate information." Ex. 11 at 1. The termination letter asserts that Larkin is barred from "tak[ing] any action that would be detrimental to CBI . . . and usurping any corporate opportunities that belong to CBI or CBWM." Id. Not mentioned in the letter was that CBI's immediate termination of Larkin also cut off his health insurance.[17] Tr. 6/21/19 at 176-77.

59.     On April 12, 2019, Larkin made a written demand for access to the books and records of CBI and CBWM in conformity with applicable law and the relevant corporate documents. Exs. 13A, 13B. Both demands were addressed to Johnny Gardner. Exs. 13A, 13B. In contravention of Rhode Island law, both demands were refused. Ex. 44; see Report I at 36. Larkin's access to the CBI and CBWM books and records was denied and not restored until the Court placed the Special Master/Receiver in charge.

60.     Also on April 12, 2019, Larkin demanded a meeting of shareholders of CBI and a meeting of members of CBWM. Exs. 12A, 12B. Yet no meeting was held. From the October 2017 closing until meetings were held on May 30, 2019, presided over by the Special Master pursuant to the directive of the Court, and despite the requirement that CBWM's members must hold an annual meeting during September each year, Ex. 4A Art. II § 2.04, and that CBI's shareholders must hold an annual meeting at least once per year, Ex. 14 Art. II § 1-2, neither of

---

[17] Larkin testified that he was subsequently notified that he could continue the health insurance if he paid for it himself. Tr. 6/21/19 at 76. With no salary and a lawsuit filed against him, Larkin explained that the cost was too much and he did not accept that option. Id.

the Companies held the required meetings. The meetings presided over by the Special Master resulted in deadlock. Exs. 18, 19.

61. In testimony that I find substantially credible, Johnny Gardner explained the reason for his actions:

> Our business was started 50 years ago. It was passed down to my father and his brothers and to me and my brother. We want nothing more for it to last the next generation for my kids and my brother's kids, if he has them or whatever.
>
> We brought someone in we thought we could help. When that didn't happen or didn't play out the way everyone thought it would, instead of coming to us and saying, this is not working, or I can't do this, he went dark and tried to put 120 people out of work.[18] I have a real problem with that. They deserve better. And that's what we are trying to fix, so it will be here for the next 50 years.

ECF No. 60-2 at 110. That is, loyalty to family was paramount.

62. I further find that Johnny Gardner's actions were motivated in part by problems that were actually the fault of the Gardners, including himself, particularly by the Gardners' anger at Larkin arising from the failure of their belated negotiations to obtain a binding right to BluShield and their alarm about the lack of financial controls (which were the responsibility of the Gardners) leading to business losses caused by CBI's growth.

*Post-Firing Events*

63. Larkin filed his counterclaim in May 2019. On June 11, 2019, claiming that the counterclaim amounted to a petition that triggered the shareholder right to buy-out the

---

[18] Johnny Gardner's testimony that Larkin "went dark and tried to put 120 people out of work" is based on information he was told by a CBI employee, Jim Phillips, after he fired Larkin from CBI. ECF No. 60-2 at 92 (Johnny Gardner testifies that Phillips told him that Larkin gave instructions to "tank the company" and "leave the Gardners with the wreckage of what was left"). During the hearing, Phillips testified to the same effect. Tr. 7/2/19 Vol. II at 55-56 (Larkin instructed him to "tank" CBI in January or February 2019). I do not find Phillips to be credible; he seemed to be currying favor with the Gardners by telling them the worst things he could about Larkin, so Phillips would be placed in charge of CBI, which is what happened. Therefore, while I credit that Johnny Gardner heard this statement from Phillips, as to its substance, I do not credit that Larkin was trying to put "120 people out of work."

petitioning shareholder, the Gardners filed notices pursuant R.I. Gen. Laws § 7-1.2-1315 claiming the right immediately to terminate and buy-out Larkin's ownership interest in both Companies.

64.     After Larkin was terminated and frozen out by CBWM and CBI and after this case was pending, the Gardners embarked on a major restructuring of CBI during which approximately twenty employees were terminated.  Despite his ongoing status as the 50% owner of CBI, and despite Larkin having hired many of these employees in reliance on his industry contacts as part of his commitment to build up CBI's business, Larkin was not consulted, conferred with or even informed that the Gardners were taking these actions.  Report II at 3; Gardner III, 2019 WL 6337686, at *2, n.4.

65.     In an attempt to ameliorate the Gardners' ongoing treatment of Larkin as if he is not an owner of 50% of the Companies as evidenced by the undisclosed restructuring, which I previously found evinces a disturbing tone-deafness to their fiduciary obligations to their equal co-owner, Gardner III, 2019 WL 6337686, at *2, n.4, I ordered the parties to conduct weekly business meetings attended by the Special Master/Receiver and that Larkin should be compensated for his time and expenses associated with the meetings.  ECF No. 121; Gardner III, 2019 WL 6337686, at *5.  This judicial intervention failed.  In Report III, the Special Master/Receiver has advised the Court, based on his first-hand observation of the proceedings at the meetings, that they have been little more than a forum for the owners of CBI and CBWM "to leverage issues in the litigation" and have been "ineffectual meetings from a business perspective."  Report III ¶ 32.

66. Following Larkin's firing by CBI, Larkin and his family had no health insurance until it was restored by the Court's Order in Gardner III, 2019 WL 6337686, at *5. See Tr. 6/21/19 at 61-62. But for the Court's action, they would continue to have no health insurance.

## B. Mixed Fact/Law Conclusions

67. The "Ownership Agreement" was a preliminary outline of concepts that reflected: (1) Larkin's intent to negotiate with the Gardners to bring the BluShield Window to the new entity that became CBWM, which would develop the capability to manufacture, and then would manufacture and sell it to a dealer network to be developed; (2) Larkin's negotiating posture that the assets of Oldco and BluShield were of equivalent value that should be merged into a new entity owned 50/50 by Larkin and the Gardners respectively; (3) the intent and understanding of Larkin, Johnny and David Gardner that the owners of CBI and CBWM would be employed by the Companies and that their sharing of profits would be accomplished through the payment of weekly salaries and the provision of health insurance.

68. There was no meeting of the minds regarding the second concept (how to value and structure an arrangement between BluShield and CBWM whereby CBWM would have the right to manufacture and sell the BluShield Window).[19] Therefore, the "Ownership Agreement" does not amount to a binding agreement by Larkin to transfer ownership of BluShield to CBWM or any other entity owned or controlled by the Gardners. Further, the Gardners knew there was no meeting of the minds and that is why they did not instruct Attorney Davis to include BluShield in the October 2017 closing documents. And, to the extent that the "Ownership Agreement" did constitute an agreement, it was superseded and voided by the CBI Amended

---

[19] Confirming the absence of a meeting of the minds, in argument, the Gardners have made clear that they dispute the "Ownership Agreement's" foundational concept there was value parity between the assets owned by Oldco and those owned by BluShield. See ECF No. 99 ¶¶ 17-18.

Stockholders' Agreement, Ex. 3 Art. 15, § 15.1, and CBWM's Operating Agreement, Ex. 4A Art. X § 10.06.

69.      Nevertheless, the "Ownership Agreement" is important evidence reflecting the parties' intent to negotiate an arrangement (perhaps a license agreement or a transfer of a membership interest) whereby the BluShield Window would be manufactured and sold by CBWM, as well as the parties' intent and understanding that Larkin's 50% ownership of CBI and the new entity (CBWM) would entitle him to employment and the payment of a salary by both entities of approximately $2000 per week.

70.      I find credible Larkin's testimony regarding salaries that "[w]e looked at it as a way of splitting up what would be profits . . . If they thought we were going to make X amount of money, instead of it being profit at the end, everybody's salary went up to take that into account."  ECF No. 60-2 at 169.  As Larkin explained, "[t]he salaries were not really intended to reflect what the responsibilities would be, but rather a means to share in the success of the company."  Id.  I do not find credible Johnny Gardner's testimony that the parties really agreed that, only if the Companies became profitable and only if "we" (that is, the Gardners) decide on distributions, would Larkin ever be paid anything as an owner of CBI and CBWM.  Id. at 107.

71.      Larkin had a reasonable belief, supported by a commonly held understanding with the other owners, that he would have ongoing employment with both of the Companies (despite his performing active work principally for CBI), and that the payment of his salary and health benefits was the "way of splitting up . . . profits," that is, the method by which owners of the Companies would share the profits of the Companies.  Id. at 169.

72.      Consistent with this understanding and agreement, during the period before Larkin was fired by each of the Companies, Larkin was paid a salary and provided health

insurance by CBI and paid a salary by CBWM, earning a total of approximately $4000 per week. See ECF No. 67-1; Tr. 6/21/19 at 175-77. During the same period, the three Gardners were paid approximately $2000 per week each (David Gardner was paid slightly less); each was also provided health insurance. See ECF No. 67-1. Consistently, Johnny Gardner testified that his father, brother and he were each paid $2000 per week, with health benefits. ECF 60-2 at 103-106; see ECF No. 67-1; Tr. 6/21/19 at 149 (salary per company set at $2000 per week). Based on this evidence, I conclude that the *status quo ante* (before Larkin was wrongfully terminated) was that Larkin was paid $2000 per week by each of the Companies and the Gardners were each paid $2000 per week by one of the Companies.

73.     Larkin's signature on the Third Note was fraudulently procured in that the Gardners deceived him (and CBWM on whose behalf he was acting) because they did not in fact agree with CBWM and Larkin that the Third Note could not and would not be enforced. I further find that the Third Note has been and remains in default. Therefore, the existence of the Third Note creates an imminent risk that, at any time, the Gardners may call the Third Note, and if CBWM lacks the cash immediately to pay $900,000 plus interest, they may assert the security interest to take back all of the assets transferred to CBWM by Oldco, leaving CBWM in liquidation and Larkin owning 50% of an entity worth nothing. I find that this would amount to irreparable harm to Larkin and to CBWM. I do not accept or credit that Gardners' argument that CBWM benefits from the non-performance of the Third Note because its equity is increased; this argument is not supported by any evidence. The Gardners' conduct in fraudulently procuring the Third Note is a profound breach of their fiduciary duty to CBWM and to Larkin. In addition to the other harms caused by this conduct, it tainted the Gardner/Larkin working relationship right out of the gate by justifiably undermining Larkin's trust in his new business partners.

74.     Larkin's abrupt firing by CBWM in November 2018, carried out by the Gardners, was – in form (made without calling a meeting of the managers or members) and substance (carried out to advance the interest of the Gardners, with little regard to the legitimate business concerns of CBWM and with no examination of whether the supposed justification could be addressed in another way) – a blatant breach of the parties' understanding regarding employment and salaries and in derogation of the fiduciary duty that the Gardners owed to Larkin as a fellow member/manager of CBWM.

75.     Larkin's firing by CBWM, carried out by the Gardners, was a breach of the duty that the Gardners assumed in signing the CBWM Operating Agreement (Ex. 4A Art. III § 3.03) to act in the mutual interests of the members.

76.     The Gardners, as controlling managers of CBWM, have engaged in a pattern of wrongful conduct, including refusing to hold mandated meetings and to allow Larkin access to the books and records, which has had the cumulative effect of freezing out Larkin, who is a 50% owner of CBWM, and of wrongfully depriving Larkin of any voice in the operations of CBWM, notwithstanding his status as a member and manager.

77.     Larkin's firing by CBI in March 2019 was carried out by Johnny Gardner in his capacity as president of CBI.  This decision to freeze out the 50% owner of CBI, who had actively worked to build it from virtually no revenues to an entity with top-line revenues of almost $7 million, was made by Johnny Gardner (without consulting the shareholders of CBI) for a pretextual reason that was actually and improperly based on the failure of the belated BluShield negotiations and on what Johnny Gardner believed would be in the interest of the Gardner family; it not based on his business judgment regarding the best interest of CBI.  This action was a breach of the parties' understanding regarding employment and salaries and in

derogation of the fiduciary duty that Johnny Gardner, as CBI's president and shareholder, and the other Gardners, as CBI's other shareholders, owed to Larkin, as a CBI 50% shareholder.

78.     On the same day that Johnny Gardner wrongfully terminated Larkin's employment at CBI, he also locked Larkin out of the premises and barred him from access to "corporate information without permission to do so given by me or my authorized representative." Ex. 11 at 1. Even limited access to books and records was wrongfully withheld until the Court entered its initial Special Master appointment order and gave the Special Master the task of addressing this issue. See May 17 Order ¶ 9. In his capacity as president of CBI, Johnny Gardner engaged in a pattern of conduct, including the refusal to convene shareholder meetings and to allow access to the books and records, that had the effect of freezing Larkin out of any voice in the operations of CBI, the company he had built.

79.     Larkin was wrongfully terminated from his employment with the Companies in that he had a reasonable expectation of continued employment as a 50% owner, that the Gardners breached their fiduciary duty to him when they terminated his employment and, to the extent that the business justification of the Companies' cash flow issues purportedly supported the Gardners' decision to terminate him, the firing was not the least harmful alternative.

80.     With no salary and benefits and no meetings, Larkin has no way to participate in receiving distributions from the Companies despite his status as an owner of 50% of each.

81.     Based on the foregoing findings, I accept and adopt the Special Master/Receiver's finding that the dysfunction at the owner level of CBI and CBWM is so crippling that it is not in the best interest of the Companies for high-level decision-making to remain in the hands of the Gardners or Larkin while litigation proceeds in this Court. Report III ¶ 9.

82.     Based on the foregoing findings, I accept and adopt the Special Master/Receiver's overarching finding that the Gardners and Larkin have demonstrable skills that could benefit CBI and CBWM if managed by a neutral chief executive officer empowered to balance the Gardner focus on manufacturing against the Larkin focus on aggressive marketing and to upgrade the Companies' financial controls, including the management of intercompany accounts. Id. ¶¶ 34-67.

83.     I find that CBI has experienced and will continue to experience harm as a result of the loss of the retail sales vision of its founder/leader Larkin, and that, in light of their history with Oldco, it is doubtful that the Gardners will be able effectively to manage the financial and administrative functions of CBI and CBWM.

84.     Based on the evidence and mindful of the parties' submissions to the Special Master/Receiver forecasting their respective visions for CBI and (as to the Gardners) for CBWM and of the Financial Consultant's summary of the most up-to-date financial results (as prepared by the Gardners) through October 31, 2019, I find that it is likely that, with a neutral chief executive officer to allocate responsibilities and manage dysfunction, CBI and CBWM are sustainable entities that can and should continue as going concerns with adequate controls and sufficient revenue to make them viable. Id.; ECF No. 140-1. Accordingly, I do not find that dissolution would be beneficial, and I specifically find that dissolution at this time would not be beneficial.

85.     The Companies will not be harmed by the payment of salaries in accordance with the parties' agreement and consistent with the *status quo ante*, prior to the Gardners' wrongful actions in freezing Larkin out of the Companies, which I find to be $2000 per week paid by one

of the two Companies to each of the Gardner owners and $2000 per week by each of the Companies to Larkin.

86.     The Companies will not be harmed by continuing to provide Larkin with health insurance benefits for himself and his family for the duration of this litigation consistent with the health insurance provided by the Companies to all of the other owners.

87.     Larkin has been and continues to be at serious risk of irreparable harm because of his inability to procure health insurance at affordable rates for himself and his family since his salary was cut off by the actions of the Gardners.  See Tr. 6/21/19 at 61-62.  But for the Court's intervention in Gardner III, 2019 WL 6337686, at *5, this harm would be continuing.

88.     Larkin is irreparably harmed by being cut off from participating in the formulation of the business strategy for CBI, the entity that he built by tapping into his network of people (friends and business associates) in the industry.  Tr. 6/21/19 at 62.  Larkin is further irreparably harmed by the limitations on his ability to compete in the regional window industry as a result of his ongoing fiduciary obligations to CBI and CBWM.  See Ex. 11.  Relatedly, Larkin is irreparably harmed by the stigma of having been unceremoniously fired "from a company that I own."  Tr. 6/21/19 at 62.

89.     As a person who relies on his salary to support his family, who abandoned other endeavors to work for CBI and CBWM, who marshaled his industry contacts and relationships to the benefit of CBI and CBWM and who has been stigmatized in the industry where he has worked all his life by the wrongful conduct of the Gardners, Larkin has been and continues to be at serious risk of irreparable harm because of the impact on himself and his family of the loss of income, health insurance and employment.

90.     To the extent that the public interest is implicated by this case's impact on the ongoing viability of two Rhode Island business entities employing not just the Gardner family members, but also a cadre of long-time employees (Ex. 50), as well as on the ability of Larkin to sustain his family and address their health issues as they arise, I find that it tips in favor of judicial intervention.

## III.     STANDARD OF REVIEW

### A.     <u>Preliminary Injunction</u>

A trial court confronted with a motion for preliminary injunction must mull four elements: the probability of the movant's success on the merits, the prospect of irreparable harm absent the injunction, the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does), and the effect of the court's action on the public interest. <u>Rosario-Urdaz v. Rivera-Hernandez</u>, 350 F.3d 219, 221 (1st Cir. 2003); <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 15 (1st Cir. 1996). The factors are not all weighted equally, however. <u>W Holding Co. v. AIG Ins. Co.-Puerto Rico</u>, 748 F.3d 377, 383 (1st Cir. 2014). "Likelihood of success is the main bearing wall" of the "framework." <u>Corporate Techs., Inc. v. Harnett</u>, 731 F.3d 6, 10 (1st Cir. 2013).

The purpose of a preliminary injunction is to preserve the *status quo* until a trial on the merits can be held; it protects the "last uncontested status which preceded the pending controversy." <u>Cohen v. Brown Univ.</u>, 809 F. Supp. 978, 999 (D.R.I. 1992) (citation omitted), <u>aff'd</u>, 991 F.2d 888 (1st Cir. 1993). To the extent that a proposed injunction alters the *status quo*, it is atypical. <u>Harris v. Wall</u>, 217 F. Supp. 3d 541, 553 (D.R.I. 2016). Designated as a "mandatory injunction," such relief "normally should be granted only in those circumstances

when the exigencies of the situation demand such relief." Braintree Labs., Inc. v. Citigroup Glob. Markets Inc., 622 F.3d 36, 41 (1st Cir. 2010); Textron Fin. Corp. v. Freeman, C.A. No. 09–087S, 2010 WL 5778756, at *2 (D.R.I. Oct. 28, 2010). Put differently, because a mandatory preliminary injunction alters rather than preserves the *status quo*, such an injunction should not issue unless the facts and the law clearly favor the moving party. Robinson v. Wall, No. C.A. 09-277-S, 2013 WL 4039027, at *2 (D.R.I. Aug. 7, 2013); see Flores v. Wall, No. CA 11-69 M, 2012 WL 4471103, at *7 (D.R.I. Sept. 5, 2012) (when injunction sought is mandatory, courts should exercise more caution); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 66 F. Supp. 2d 317, 327 (D.R.I. 1999) (same).

Preliminary injunction rulings are, by definition, premised on a tentative development of the facts, which will be fleshed out as trial approaches. Rosario-Urdaz, 350 F.3d at 223. In cases like this one, where a claimant alleges wrongful termination resulting in irreparable harm due to the individual's loss of income and the barriers to restoring income and status caused by the termination, the law's "overarching preference is for reinstatement" of the wrongfully terminated employee. Selgas v. Am. Airlines, Inc., 104 F.3d 9, 13 (1st Cir. 1997); Gardner III, 2019 WL 6337686, at *2-3; see, e.g., Romero Feliciano v. Torres Gaztambide, 836 F.2d 1, 2-4 (1st Cir. 1987) (when claimant demonstrates likelihood of success on claim of wrongful termination based on exercise of First Amendment right, preliminary injunction appropriate to redress irreparable harm from "loss of his job *per se*"). When the likelihood of success on the merits of a claim of wrongful termination is established, an interim injunction may order reinstatement to address irreparable harm found by the trial court based on an evidentiary proceeding. Rosario-Urdaz, 350 F.3d at 221-22; see, e.g., Stone v. Trump, 280 F. Supp. 3d 747, 768 (D. Md. 2017) (transgender military service members were entitled to preliminary injunction

requiring reinstatement pending equal protection challenge to presidential directive); Roig v. P.R. Nat'l Guard, 47 F. Supp. 2d 216, 222 (D.P.R. 1999) (loss of job and stigma of being discharged for person whose salary represents his livelihood causes undue hardship to him and his family and gives rise to irreparable harm that supports interim injunction ordering reinstatement).

### B.    Receiver *Pendente Lite*

Whether jurisdiction is derived from a federal question or from state law in a diversity action like this one, a federal court may exercise its inherent equitable power at the behest of a private party to protect purely private interests by appointing a receiver. Conley v. Competitive Techs., Inc., M.C. No. 18-15-JJM-PAS, 2018 WL 4562350, at *2 (D.R.I. Sept. 24, 2018), adopted by Text Order, (D.R.I. Oct. 11, 2018). This Court "has inherent power to appoint [a] receiver to manage [a] defendant's assets pending litigation"; "[r]eceiverships are and have for years been a familiar equitable mechanism." Pioneer Capital Corp. v. Environamics Corp., No. Civ. 02-217-P-C, 2003 WL 345349, at *9 (D. Me. Feb. 14, 2003), adopted, No. CIV. 02-217-PC, 2003 WL 1923765 (D. Me. Apr. 23, 2003) (citing United States v. Quintana-Aguayo, 235 F.3d 682, 686 n. 8 (1st Cir. 2000); Morgan v. McDonough, 540 F.2d 527, 533 (1st Cir. 1976)). "[F]ederal law governs the issue of whether to appoint a receiver in a diversity action." Canada Life Assur. Co. v. LaPeter, 563 F.3d 837, 843 (9th Cir. 2009); see Chase Manhattan Bank, N. A. v. Turabo Shopping Ctr., Inc., 683 F.2d 25, 26 (1st Cir. 1982).

The appointed receiver must be a non-governmental employee, 28 U.S.C. § 958, who acts as an officer of the court and, as such, does not owe allegiance to either party, but rather acts as a fiduciary on behalf of both. U.S. Bank Nat'l Ass'n v. SRA Augusta SPE, LLC, 1:16-cv-00410-JDL, 2016 WL 6808132, at *4 n.9 (D. Me. Nov. 17, 2016). Consistent with these principles,

Rule 66 of the Federal Rules of Civil Procedure requires that the receiver's practice in administering the estate to "accord with the historical practice in federal courts." Fed. R. Civ. P. 66 (titled "Receivers"). Federal law also requires the receiver to manage and operate the property according to the requirements of the "valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." 28 U.S.C. § 959(b).

In its seminal decision, Consol. Rail Corp. v. Fore River Ry. Co., 861 F.2d 322 (1st Cir. 1988), the First Circuit set out the factors that are relevant for a district court exercising its discretion in determining whether to appoint a receiver: (1) whether the defendant is alleged to have engaged in fraudulent conduct; (2) whether the property is in imminent danger; (3) whether the available legal remedies are adequate; (4) whether the harm to the plaintiff caused by the denial of the appointment would exceed the harm to the defendant and others opposed to the appointment; (5) whether the plaintiff is likely to succeed in the action; (6) whether the plaintiff's interests in the property might be susceptible to irreparable injury; and (7) whether the interests of the plaintiff and others sought to be protected will be well served by the receivership. Id. at 326-27; Conley, 2018 WL 4562350, at *2; U.S. Bank Nat'l Ass'n, 2016 WL 6808132, at *4. A court's equitable powers in determining to appoint a receiver are exercised with broad discretion in consideration of the relevant factors; no one factor is dispositive. LaPeter, 563 F.3d at 845. "[T]he appointment of a receiver is not an end in and of itself; rather, it is a means by which to reach some legitimate end." Fed. Nat'l Mortgage Ass'n v. Wellington Invs., LLC, No. 11-11414, 2011 WL 2787270, at *2 (E.D. Mich. July 15, 2011) (citing Kelleam v. Maryland Cas. Co. of Baltimore, 312 U.S. 377, 381 (1941)). Consequently, a receiver may be appointed only as ancillary relief to a suit pending for primary relief. Id. "Receivership is an extraordinary

remedy, justified only when a clear showing is made that an 'emergency exists, in order to protect the interests of the plaintiff in the property.'" Capital Fin., LLC v. 22 Maple St., LLC, 295 F. Supp. 3d 19, 23 (D. Mass. 2018) (quoting Commodity Futures Trading Comm. v. Comvest Trading Corp., 481 F. Supp. 438, 441 (D. Mass. 1979)).

One circumstance in which a receiver may be appointed is when the owners of an entity – whether shareholders of a corporation or members of a limited liability company – are in deadlock. This is not necessarily as an anticipatory adjunct to dissolution, but rather to serve as a temporary custodian or manager of the corporate assets and business when deadlock has paralyzed corporate functioning and threatens serious detriment to the interests of the stockholders and the corporation as a solvent prosperous entity. Theresa Ludwig Kruk, Annotation, Relief Other than by Dissolution in Cases of Intracorporate Deadlock or Dissension, 34 A.L.R. Fed. 13 § 2[a] (1984). The degree of intracorporate discord and its effect upon the profitable operation of the corporation are the primary considerations. Id.

While the federal court's authority to appoint a receiver *pendente lite* flows from its inherent powers, the federal court may not ignore state law – the internal affairs of a corporation, "including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares," are governed by the laws of the jurisdiction of incorporation. Hollis v. Hill, 232 F.3d 460, 465 (5th Cir. 2000). Because the Companies are both Rhode Island entities, pivotal is the Rhode Island Supreme Court's holding that, in Rhode Island, the power to appoint a non-liquidating receiver derives both from the court's inherent jurisdiction, as well as from the applicable statute, R.I. Gen. Laws § 7-1.2-1323.[20] Peck v.

---

[20] The Rhode Island statute on the appointment of a receiver provides in relevant part as follows:

**§ 7-1.2-1323. Jurisdiction of court to appoint a receiver**

Jonathan Michael Builders, Inc., 940 A.2d 640, 643 (R.I. 2008); see Kent, Simpson, Flanders,

Wollin, Rhode Island Civil and Appellate Procedure § 66:2 (Nov. 2018 Update) ("The superior

court has the authority to appoint a receiver to . . . operate the corporation when liquidation is

inappropriate . . . [as] set forth in R.I. Gen. Laws § 7-1.2-1323").

Section 7-1.2-1323 makes no distinction between solvent and insolvent corporations; it

provides that, acting as a court of equity and in the interests of justice, the court "has full power

to appoint a receiver, with any powers and duties that the court, from time to time, directs."  R.I.

Gen. Laws § 7-1.2-1323(1-2).  This plenary power to appoint a receiver arises "[u]pon the

establishment of any of the grounds for liquidation of the assets and business of . . . [a] domestic

corporation," but that "liquidation would not be appropriate."  Id.  As relevant here, the "grounds

for liquidation" are set out in R.I. Gen. Laws § 7-1.2-1314 (quoted in note 30 *infra*).  They

include ownership or management deadlock; acts by those in control[21] that are illegal,

oppressive, or fraudulent; misapplication or danger of waste or loss of corporate assets; and

internal dissension threatening serious harm to the business and affairs of the entity.  R.I. Gen.

Laws § 7-1.2-1314(a)(1)(i-v).

While the Rhode Island Supreme Court has not directly addressed the appointment of a

receiver *pendente lite* in circumstances analogous to those presented here, several cases from

---

Upon the establishment of any of the grounds for liquidation of the assets and business of . . . [a]
domestic corporation . . . and upon the establishment that the liquidation would not be appropriate,
the superior court has full power to appoint a receiver, with any powers and duties that the court,
from time to time, directs, and to take any other proceedings that the court deems advisable under
the circumstances. The provisions of §§ 7-1.2-1314 - 7-1.2-1322, insofar as they are consistent
with the nature of the proceeding, apply to the proceeding, and in the proceeding the court has the
full powers of a court of equity to make or enter any orders, injunctions, and decrees and grant any
other relief in the proceeding that justice and equity require.

[21] Importantly, the issue is control – for example, in the case, the Gardners are controlling, but not majority owners,
consistent with the principle that "a non-majority shareholder who dominates a corporation through actual control of
corporate conduct may be deemed a controlling shareholder."  In re PHC, Inc. S'holder Litig., 894 F.3d 419, 429
(1st Cir. 2018), cert. denied sub nom. Shear v. MAZ Partners, LP, 139 S. Ct. 489 (2018).

Delaware are instructive.[22]  For example, in <u>Shawe v. Elting</u>, 157 A.3d 152 (Del. 2017), the

Delaware Supreme Court affirmed the appointment of a custodian[23] with the scope of the

appointment carefully calibrated to address the crisis caused by the deadlock of the two founding

shareholders, who effectively owned 50% each, where the dysfunction between them was

causing threatened and actual irreparable injury to the corporation.  <u>Id.</u> at 162; <u>see</u> <u>Miller v.</u>

<u>Miller</u>, C.A. No. 2140-VCN, 2009 WL 554920, at *5 (Del. Ch. Feb. 17, 2009) (owner deadlock

that had not yet resulted in palpable immediate harm addressed in appointment of custodian with

carefully tailored authority to break deadlock and pursue alternatives for disentanglement of the

brothers' interest in company).  Perhaps the closest Delaware case to the circumstances presented

here is <u>Giuricich v. Emtrol</u>, 449 A.2d 232 (Del. 1982), in which the Delaware Supreme Court

found that it was reversible error for the Court of Chancery to refuse to appoint a custodian when

shareholder deadlock created the prospect that control of the entity would remain indefinitely in

the hands of an entrenched board of directors, freezing out "their 50-50 partners, the plaintiffs."

<u>Id.</u> at 239.  The court held: "[t]his is an unworthy purpose, creating a situation violative of

corporate democracy."  <u>Id.</u>; <u>see</u> <u>Drob v. Nat'l Mem'l Park</u>, 41 A.2d 589, 598 (Del. 1945)

("[D]issensions resulting in a deadlock among either the directors or between small groups

holding equal amounts of stock, making it impossible, for the time being to carry on the

---

[22] The Rhode Island Supreme Court has repeatedly held that it is appropriate to turn to Delaware decisions for guidance when considering corporate law issues that are not fully developed in Rhode Island jurisprudence.  <u>See</u> <u>Heritage Healthcare Servs., Inc. v. Beacon Mut. Ins. Co.</u>, No. C.A. 02-7016, 2004 WL 253547, at *6 (R.I. Super. Ct. Jan. 21, 2004) (citing <u>Bove v. Comm. Hotel Corp.</u>, 249 A.2d 89, 93 (R.I. 1969) (in area of corporate law, Delaware case law is a valuable tool for Rhode Island courts to utilize)).

[23] Under Delaware law, the term "custodian" is used for the appointment of a receiver of a solvent entity, to distinguish it from the "receiver" who is appointed for an insolvent one.  <u>Shawe</u>, 157 A.3d at 161.  The scope of the assigned duties is up the court making the appointment.  <u>Id.</u> at 163 (custodian's default duty is to continue corporation's business, but Court of Chancery may displace default duty).

corporate business to the advantage of the interested parties may justify the appointment of a temporary receiver to preserve the corporate assets until it can function properly.")

Decisions from other states are similar. For example, in Pennsylvania, a court found that the commission by the 50% controlling owner of illegal acts – breach of fiduciary duty and breach of contract – towards the other 50% owner was sufficient to result in the appointment of a custodian to resolve the shareholder dispute even though the business was prospering. Baron v. Pritzker, No. 1574, 2001 WL 1855054, at *3-4 (Pa. Ct. Common Pleas Mar 6, 2001). In Colorado, the state's supreme court remanded a case for appointment of a receiver to break a deadlock, where 50% of the stockholders had assumed control, excluding the owner of the other 50%, terminating his employment and stopping his salary. Burleson v. Hayutin, 273 P.2d 124, 126-27 (Colo. 1954). Other state courts have applied the same principles to limited liability companies. See, e.g., Georgia Rehab. Ctr., Inc. v. Newnan Hosp., 658 S.E.2d 737, 738-39 (Ga. 2008) (when 50/50 owners could not agree about management and entity's financial affairs, and no meaningful accounting could be done because of their dispute, no abuse of discretion in appointing neutral receiver to manage the affairs during pendency of further proceedings).

## IV.    ANALYSIS

### A.    Likelihood of Success

Whether the Court is focused on the preliminary injunction or on the motion for appointment of a receiver *pendente lite*, the "main bearing wall" of the analysis is Larkin's likelihood of success on the Counts in his counterclaim that are pivotal to the determination. See Corporate Techs., Inc., 731 F.3d at 10 (preliminary injunction depends on movant's probability of success on merits of claims); Consol. Rail Corp., 861 F.2d at 326-27 (appointment of receiver depends on whether plaintiff is likely to succeed).

### 1. Breach of Fiduciary and Other Duties – Counts III, IV and V

The first three substantive Counts[24] in Larkin's counterclaim are derived from his allegation that the Gardners breached fiduciary and statutory duties owed to him as an equal shareholder of CBI and an equal member and one of the managers of CBWM. Specifically, Count III alleges that the Gardners breached their fiduciary duty by engaging in oppressive and unjustifiable conduct to freeze Larkin out of CBI and CBWM and to deprive him of his salary and benefits, thereby divesting him of his right to participate in the Companies' earnings and stripping him of the value of his ownership interests. Count IV focuses on the Gardners' statutory, contractual and fiduciary obligation to afford Larkin (as a 50% owner) access to the Companies' books and records, including for the purpose of exercising his right to investigate the conduct of the Gardners in managing the Companies, to determine the Companies' financial condition and to get an accounting of the stewardship of the Gardners since they froze him out. And Count V asserts Larkin's reasonable expectation based on the parties' mutual understanding that he would be employed by both CBI and CBWM and paid by each a salary of at least $100,000 plus health benefits. For the reasons that follow, I conclude that it is not just probable, but overwhelmingly likely, that Larkin will prevail on each of these Counts.

The Court's legal analysis is anchored by the time-honored default principle that corporate entities are to be democratically governed unless otherwise provided by their foundational documents. Giuricich, 449 A.2d 239. Consistent with this principle, the Rhode Island Supreme Court's seminal decision in Hendrick v. Hendrick, 755 A.2d 784 (R.I. 2000),

---

[24] Count I of the counterclaim was voluntarily dismissed. Gardner II, 2019 WL 5964751, at *1, n.3. Count II does not state a substantive cause of action, but rather asks for a remedy – the appointment of a receiver *pendente lite* while this case is pending – based on the undisputed and persistent deadlock of the owners, which has prevented and will continue to prevent the election of officers and managers.

holds that, "[c]orporate officers and directors of any corporate enterprise, public or close, have long been recognized as corporate fiduciaries owing a duty of loyalty to the corporation and its shareholders." Id. at 789 (citing A. Teixeira & Co. v. Teixeira, 699 A.2d 1383, 1386 (R.I. 1997)). The Rhode Island Supreme Court has further specifically held that, when a close corporation's owners are few, are all active in the business, and have close and intimate working relationships and mutual dependence on each other for the success of the enterprise, the duty owed is one of utmost care and loyalty, a higher duty than that of corporate officers in other settings. A. Teixeira & Co, 699 A.2d at 1386-87; Tomaino v. Concord Oil of Newport, Inc., 709 A.2d 1016, 1021 (R.I. 1998); Grady v. Grady, No. PB 09-0367, 2012 WL 171006, at *4 (R.I. Super. Ct. Jan. 17, 2012).

This heightened duty applies to the Gardners as owners of CBI. CBI is a close corporation that has only four shareholders, whose operations (before the Gardners froze Larkin out) required intimate working relationships between the two owners (Larkin and Johnny Gardner) who were actively participating like partners in CBI's management. See Ex. 3 at 1 ¶ D (CBI Amended Stockholders' Agreement: shareholders "will be able to deal easily and comfortably with each other and that it is in their best interests and in [CBI]'s best interests that all corporate activities be controlled by persons who deal comfortably with each other."); Bogosian v. Woloohojian, 167 F. Supp. 2d 491, 497 (D.R.I. 2001), appeal denied, judgment aff'd sub nom. Bogosian v. Woloohojian Realty Corp., 323 F.3d 55 (1st Cir. 2003) (heightened fiduciary duty applies to close corporation because entity owned by only three siblings who managed it as if they were partners); A. Teixeira & Co., 699 A.2d at 1387 (heightened fiduciary duty applies to close corporation because it had small number of owners all active in business who functioned as partners). This heightened duty particularly applies to Johnny Gardner as the

corporate officer (president, secretary and treasurer) of CBI: "an officer of a corporation stands in a fiduciary relationship toward its stockholders and his position in relation to that group is analogous to that of trustee[,] . . . the duty . . . to act with the utmost good faith." Point Trap Co. v. Manchester, 199 A.2d 592, 595-96 (R.I. 1964).

The same principles apply to CBWM, as a limited liability company. While the Rhode Island Supreme Court has not addressed the precise issue, in reliance on Marsh v. Billington Farms, LLC, No. 04-3123, 2006 WL 2555911 (R.I. Super. Ct. Aug. 31, 2006), I conclude it would hold that, in the circumstances presented here, with only four members, active participation by Larkin and the Gardners, and the intimate relationship among the four, the members of CBWM assumed a heightened fiduciary duty of utmost care, loyalty, and good faith, not only to CBWM, but to each other. Id. at *5; see Marsh v Billington Farms LLC,[25] No. PB 04-3123, 2007 WL 2344029, at *9, n.20 (R.I. Super. Ct. Aug. 10, 2007) (prior holding reaffirmed).[26] This duty means that the controlling group may not oppress any member through "conduct that substantially defeats the 'reasonable expectations'" held by that member. Marsh, 2006 WL 2555911, at *6 (citing Hendrick, 755 A.2d at 791). Nor may they deviate "from a heightened good faith standard that exists in closely held corporations" or engage in a "pattern of conduct . . . manifesting itself in more distinct, identifiable actions." Hendrick, 755 A.2d at 792.

---

[25] The on-line version of this Marsh decision lacks page numbers, so my pin cites refer to the page numbers on the printed copy of the on-line version.

[26] In Sweeney v Reed, No. NC-2005-0565, 2010 WL 581513 (R.I. Super. Ct. Feb. 12, 2010), a case that also involved the duty of members of a limited liability company, another Superior Court justice declined to apply the "utmost" duty, holding that such a duty is not universally applicable to all limited liability companies, but that it does apply in circumstances analogous to those found in Marsh. Id. at *6, n.3 (describing Marsh as finding that "managers of an LLC have fiduciary duties to the LLC, but that members of this LLC also owed each other a duty of 'utmost care, loyalty, and good faith'").

These duties provide the standard against which this Court must measure the Gardners'
conduct towards Larkin and towards CBI and CBWM.

First, the evidence overwhelmingly establishes that the Gardners have engaged in
oppressive conduct in their treatment of Larkin with respect to both CBI and CBWM.  In this
context, "oppression" is defined as conduct that deviates from the heightened good faith standard
that exists in closely held corporations "that substantially defeats the 'reasonable expectations'"
held by the owners when they became involved with the enterprise.  Id. at 791-92.  As Hendrick
recognizes, oppressive conduct can manifest itself in a range of actions designed to disadvantage
or freeze out an owner and defeat his reasonable expectations; for example, the controlling
owners may deprive a non-controlling owner of corporate offices or of employment by the
entity; they may take actions that have the cumulative, overall effect of freezing out or depriving
another owner of a voice in the entity's business; they may withhold relevant financial
information; they may refuse to share earnings; and they may drain off the corporation's earnings
in the form of salaries for themselves and perhaps their relatives.  Id.  The termination of
employment can be oppressive conduct when such employment and the related salary is part of
the excluded owner's reasonable expectation based on the understanding formed at the time of
the making of the investment that he would be able to work as an employee to improve the
company's business and that the salary would be the principal return on the investment.[27]
Grady, 2012 WL 171006, at *4.  "That a controlling shareholder cannot, consistent with his
fiduciary duty, effectively deprive a minority shareholder of his interest as a shareholder by

---

[27] This principle is not an alteration of the at-will employment rule.  Rather, it derives from the owners' fiduciary
duty, focused on the "expectations [that often] arise from understandings that are not expressly stated in the
corporation's documents," Grady, 2012 WL 171006, at *7, *11, and in recognition that "continued employment is
often a key expectation of shareholders" in a close corporation."  Id. (citing Hendrick, 755 A.2d at 791-92).

terminating the latter's employment or salary has been widely accepted." See Hollis, 232 F.3d at 470-71 (firing of 50% founder/shareholder rendered shares worthless).

The denial of employment is particularly pernicious here. The evidence establishes that Larkin abandoned other endeavors and embarked on becoming an investor in CBI (with collateral benefits to CBWM) by dedicating his experience, sales savvy and industry contacts in reliance on the clear understanding that he would work – in effect as a founder – to build CBI's retail sales and would be paid a salary in excess of $100,000 by each entity. See Wilkes v. Springside Nursing Home, Inc., 353 N.E.2d 657, 662 (Mass. 1976) ("The minority stockholder typically depends on his salary as the principal return on his investment, since the 'earnings of a close corporation . . . are distributed in major part in salaries, bonuses and retirement benefits.'"). The evidence is clear that Larkin reasonably expected to be employed and relied on his salary as the principal return on his investment. Grady, 2012 WL 171006, at *4. And he delivered – Larkin built up CBI's business almost from scratch and benefited CBWM, yet with no evidence that dividends ever were or would be declared by either entity, his interests in CBI and CBWM have become virtually valueless. Id. at *5.

In these circumstances, Grady provides the decisional rubric to determine whether the firing of an owner of a close corporation (or limited liability company) amounts to a breach of fiduciary duty: Grady holds that, if a shareholder in a close corporation has a reasonable expectation of continued employment, as Larkin clearly did, the shareholders who terminated his employment (the Gardners) not only must act based on the entity's legitimate business purposes, but also must have concluded that the firing of an owner with a reasonable expectation of employment is the least harmful alternative for achieving those purposes. Id. at *9, *11. Evidence that a firing is not the least harmful alternative may include: the firing shareholders

failed to speak directly to the fired shareholder about addressing what is later claimed to be the issue of concern; the lack of a shareholders' meeting at which firing is agreed to; or the timing of the firing puts it squarely into the center of negotiations between the fired shareholder and the other shareholders regarding a corporate issue. Id. at *11 (citing Wilkes, 353 N.E.2d at 664).

The evidence here establishes that the Gardners forced Larkin out of CBWM and then out of CBI because, as with Oldco, the financial controls (for which the Gardners, particularly Johnny Gardner, were responsible) were not keeping pace with the rapid growth created by Larkin; because after the clumsy firing of Larkin by CBWM, the Gardners realized they had failed to negotiate a binding agreement to bring BluShield to CBWM; and because, at bottom, Larkin was an outsider, not a member of the Gardner family, whom the Gardners considered expendable. ¶¶ 51-55, 61-62 supra. The Gardners acted as a cabal in making the decisions to fire their co-owner in that there was no communication to Larkin and no shareholder or member meeting. ¶¶ 51, 57 supra. Moreover, as in Wilkes, the CBI firing decision immediately followed the failure of the tense and belated negotiations with Larkin about BluShield (¶¶ 55, 57 supra). See Wilkes, 353 N.E. 2d at 664 (when termination of aggrieved shareholder followed tensions that arose as remaining shareholders tried to buy out shares at unreasonably low price, termination is nefarious plot in breach of fiduciary duty). Under such circumstances, when the Court cannot see any reason for the termination of the employment of a co-owner other than a nefarious plot on the part of the fellow owners to take his ownership interest for themselves, it is not a stretch to conclude that they have breached their fiduciary duty. Grady, 2012 WL 171006, at *11 (citing Wilkes, 353 N.E.2d at 664). When the Grady test is applied to the Gardners' actions in firing Larkin from CBWM and CBI, the answer is plain – the Gardners conduct amounts to oppression in breach of their fiduciary duty. See ¶¶ 69-72, 74-75, 77, 79-80 supra.

Another extremely troublesome breach of fiduciary duty committed by the Gardners is the fraudulent procurement of Larkin's signature on behalf of CBWM on the Third Note. ¶¶ 21-29, 73 *supra*. The Gardners procured Larkin's signature in reliance on their promise that the Third Note was not enforceable, yet John Sr. reported the Third Note to the IRS as an enforceable obligation; he testified that the agreement not to enforce it was just between him and his sons and not with CBWM; and the Gardners have since caused the Third Note to be carried on CBWM's books as if it were a real obligation. As a non-performing promissory obligation, the Third Note effectively gave the Gardners a tool that empowered them to claw back CBWM assets leaving CBWM potentially with nothing and Larkin owning half of nothing. And the circumstances of its procurement poisoned the parties' subsequent working relationship. I find that the procurement of the Third Note was fraudulent and a profound breach of the Gardners' fiduciary duty to CBWM and to Larkin.

The last of the serious breaches committed by Gardners is the foundation for Count IV of the Larkin counterclaim – the denial of Larkin, as a 50% owner, of his right of access to the books and records of both CBI and CBWM. ¶¶ 40, 58-59, 76, 78 *supra*. By law, CBI is obliged to allow any shareholder to inspect and copy its books and records of account, minutes and record of shareholders upon the making of a written demand stating the purpose of the demand. R.I. Gen. Laws § 7-1.2-1502(b). This shareholder right of inspection is grounded in ownership status, based on the right and interest of shareholders to ensure that the corporation is efficiently and profitably managed; proper purposes for the demand include to investigate the conduct of management, to determine the financial condition of the corporation, and generally to seek an accounting of the stewardship of the officers and directors. <u>Sarni v. Meloccaro</u>, 324 A.2d 648, 653 (R.I. 1974). The duty to comply rests not just on the corporation, but also on its officers.

R.I. Gen. Laws § 7-1.2-1502(c). In the case of CBI, Johnny Gardner was the individual charged with the legal duty to comply with this obligation. His flagrant failure to comply with Larkin's appropriate written request renders both the entity (CBI) and the responsible individual (Johnny Gardner) potentially liable to the demanding shareholder (Larkin) for a penalty in the amount of 10% of the shareholder's interest in the corporation. Id. Similarly, as to CBWM, both by statute (R.I. Gen. Laws § 7-16-22(b)) and by the express terms of the Operating Agreement (Ex. 4A Art. IV), Larkin, as a member, was entitled to have access to its books and records. The Gardners' undisputed and flagrant denial of Larkin's right of access to the CBI and CBWM books and records, which was not ameliorated until the Court intervened by assigning this task to the Special Master/Receiver, May 17 Order ¶ 9; October 31 Order ¶ 7, is the foundation for my finding that Larkin is likely to succeed on the merits of Court IV.

To recap, the evidence clearly establishes that the Gardners' unilateral actions in firing and freezing out Larkin from CBI and CBWM and in fraudulently procuring the Third Note amount to paradigmatic oppressive and wrongful conduct in breach of their heightened duty of utmost care, loyalty and good faith. Therefore, Larkin is likely to succeed on the merits of Counts III, IV and V of his counterclaim.

### 2. Declaratory Relief Regarding "Ownership Agreement" – Count VI

Count VI of Larkin's counterclaim asks for declaratory judgment regarding the enforceability of the "Ownership Agreement," ¶ 14 *supra*, on which Johnny and David Gardner rely to support their claim to ownership of BluShield. Specifically, Larkin asks the Court to declare that the "Ownership Agreement" does not constitute a binding agreement but rather was an outline of an understanding among Larkin, Johnny and David Gardner that, at least as to BluShield, was abandoned as the negotiations continued. As my findings reveal, the conclusion

that the "Ownership Agreement" does not reflect a meeting of the minds regarding the transfer of BluShield to CBWM is not a stretch – Johnny Gardner himself essentially admitted that there was no binding agreement. See ¶¶ 16, 18-20, 67-68 *supra* (regarding structure of transaction in "Ownership Agreement," "I would not have gone that route"; as to the document, it is not the final legal draft). The testimony of the Gardner's long-time attorney, Attorney Davis, is equally clear – Larkin's consideration for becoming an owner of CBWM (and CBI) was to dedicate his "strong sales ability . . . and . . . the hope was that these companies would do great"; BluShield was not part of the transaction or Attorney Davis would have included it in the final documents. ¶ 20 *supra*. In any event, to the extent that the Court somehow finds that the "Ownership Agreement" did require Larkin to transfer his BluShield shares to Johnny and David Gardner, that agreement was voided by the subsequent agreements executed at the October 2017 closing that expressly superseded (as to CBI) and contained an integration clause (as to CBWM) negating any such prior agreement. ¶¶ 35, 44 *supra*. These binding agreements omit any reference to BluShield and Larkin's supposed promise to convey it.

Larkin is likely to succeed on the merits of Count VI of his counterclaim.[28]

### 3. Declarative Relief Regarding Buy-out Rights – Count VII

---

[28] While not directly material to Larkin's likelihood of success on Count VI, Count III (unjust enrichment) of the FAC presents another tangled issue regarding BluShield to be resolved in this case. Larkin, as a member of CBWM, owed the same fiduciary duty to CBWM and to his co-members that the three Gardners owed him. And the parties intended that CBWM would develop a BluShield prototype suitable for manufacture; after the October 2017 closing, Larkin was actively working with Scott Gardner to achieve that goal. Was Larkin duty-bound to negotiate in good faith towards a license or transfer of BluShield to CBWM? If the answer is yes, was that duty voided by the Gardners' wrongful conduct in terminating him from CBWM? And what is the significance of the unsuccessful BluShield negotiations that the Gardners initiated only after they fired Larkin from CBWM, the failure of which is a cause of their wrongful firing of Larkin from CBI? In short, while Larkin is likely to succeed on the merits of Count VI of his counterclaim, there remain serious issues to litigate regarding what CBWM's rights with respect to BluShield might be, how those rights affect CBWM's value and who (Larkin or Gardners or all of them) are responsible for any diminution.

Count VII of Larkin's counterclaim asks the Court to declare the rights of the parties pursuant to R.I. Gen. Laws § 7-1.2-1315,[29] the "buy-out statute," as well as the related provision, R.I. Gen. Laws § 7-1.2-1314,[30] which deals with liquidation. Specifically, he asks the Court to declare that his counterclaim is not a petition within the meaning of R.I. Gen. Laws § 7-1.2-1315 and that it has not vested the right in the remaining shareholders to make a binding election to buy-out his shares, effectively wiping out all of his rights as an owner of CBI and CBWM without regard to the inequitable nature of such an outcome. Larkin also asks the Court to

---

[29] In relevant part, R.I. Gen. Laws § 7-1.2-1315 provides:

> Whenever a petition for dissolution of a corporation is filed by one or more shareholders (subsequently in this section referred to as the "petitioner") pursuant to either § 7-1.2-1314 or a right to compel dissolution which is authorized under § 7-1.2-1701 or is otherwise valid, one or more of its other shareholders may avoid the dissolution by filing with the court prior to the commencement of the hearing, or, in the discretion of the court, at any time prior to a sale or other disposition of the assets of the corporation, an election to purchase the shares owned by the petitioner at a price equal to their fair value. . . . The petitioner is entitled to interest, at the rate on judgments in civil actions, on the purchase price of the shares from the date of the filing of the election to purchase the shares, and all other rights of the petitioner as owner of the shares terminate on that date.

[30] In relevant part, R.I. Gen. Laws § 7-1.2-1314 provides:

> (a)  The superior court has full power to liquidate the assets and business of a corporation:
> > (1) In an action by a shareholder when it is established that, whether or not the corporate business has been or could be operated at a profit, dissolution would be beneficial to the shareholders because:
> > > (i) The directors or those other individuals who may be responsible for management pursuant to § 7-1.2-1701(a) are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock; or
> > > (ii) The acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent; or
> > > (iii) The shareholders are deadlocked in voting power, and have failed, for a period which includes at least two (2) consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election and qualification of their successors; or
> > > (iv) The corporate assets are being misapplied or are in danger of being wasted or lost; or
> > > (v) Two (2) or more factions of shareholders are divided and there is such internal dissension that serious harm to the business and affairs of the corporation is threatened[.]

declare that the § 1315 election is subject to principles of equity and justice and that the Gardners' wrongful, oppressive and fraudulent conduct should estop them from invoking it.[31]

Count VII does not raise a hypothetical question – on June 11, 2019, the Gardners filed their § 1315 notices of elections to buy-out Larkin's ownership interests in CBI and CBWM. ECF Nos. 54, 55. They contend that these notices, by operation of § 1315's mandate that "all other rights of the petitioner as owner of the shares terminate," immediately stripped Larkin of his ownership interests in CBI and CBWM, leaving only the question of what he will be paid after all issues have been litigated to conclusion.[32] ECF No. 56 at 4-6, 10-14.

As to CBWM, the Gardners' § 1315 election may swiftly be dispensed with – § 1315 does not apply to limited liability companies. Page v ADS Invs., LLC, No. NM-2006-0334, 2014 WL 3891211, at *8 (R.I. Super. Ct. Aug. 5, 2014) ("§ 7-1.2-1315 is quite clearly found in the Rhode Island Business Corporation Act, and therefore, the Court declines to include the reference to 'corporations' in § 7-1.2-1315 to include an LLC"). Therefore, the Gardners' election as to CBWM is a nullity. Nor does the court's use of the buy-out option for a limited liability company in Marsh, 2007 WL 2344029, suggest a different conclusion – Marsh holds only that a court **may** use the § 1315 buy-out remedy for a limited liability company when the parties agree. Id. at *3-4, n.4 (due to parties' stipulation, court enforces buy-out). Significantly, the Rhode Island General Assembly has repeatedly considered bills to extend § 1315 to limited liability companies and has declined to act. See, e.g., Page, 2014 WL 3891211, at *8 n.7 (Rhode

---

[31] Larkin further argues that he might wish to exercise the right to a buy-out election for himself, but has been unable to determine whether to do so because of the Gardners' violation of law in depriving him of access to books and records, as well as because of the cloud caused by the Gardners' claim to BluShield. ECF No. 41 ¶¶ 64-70.

[32] The Court observes that § 1315 requires the shareholder intending to buy-out another's shares to "giv[e] a bond or other security sufficient to assure . . . payment," unless there is agreement on value. R.I. Gen. Laws § 7-1.2-1315. As of this writing, the Gardners have failed to comply with this requirement.

Island Senate Committee on Commerce heard proposed amendment on April 11, 2014; held for further study); Session Year 2019, R.I. House Bill No. 5682, (to permit limited liability company member to avoid dissolution through buy-out; held for further study), available at, http://webserver.rilin.state.ri.us/BillText/BillText19/HouseText19/H5682.pdf.

Instead of § 1315, CBWM's remedy for owner deadlock and dissension is grounded in the Court's inherent equitable powers. As <u>Page</u> holds, oppressed members of a limited liability company are not without remedies in that the court's equitable powers may be mobilized to avoid a circumstance where the wrongdoers' misdeed "stand[s] uncorrected." <u>Page</u>, 2014 WL 3891211, at *10; <u>see</u> <u>A. Teixeira & Co., Inc. v. Teixeira</u>, P.C. 84-0152, 1994 WL 930950, at *8 (R.I. Super. Ct. July 21, 1994), <u>aff'd sub nom.</u>, 674 A.2d 407 (R.I. 1996) (although § 1315 not triggered because majority did not oppress minority, court orders buy-out by majority of minority as proper exercise of "panoply of alternative remedies to which a court may turn where relief is warranted"). Thus, with respect to CBWM, I find that Larkin is likely to succeed on the merits of Count VII in that the Court is likely to declare that whether it will resolve the CBWM deadlock by ordering a buy-out of Larkin's interest by the Gardners, or *vice versa*, will depend on what is remedy is consistent with equitable principles.

By contrast, CBI is a close corporation to which § 1315 does apply. The Court's analysis of its applicability to this case must begin with examination of Rhode Island's overarching statutory scheme, of which § 1315 is just one part. As relevant here, the Rhode Island General Laws contain four provisions, which create four paths for a close corporation like CBI whose owner deadlock has given rise to one or more of the "grounds for liquidation" listed in R.I. Gen. Laws § 7-1.2-1314. First, if liquidation would not be appropriate, R.I. Gen. Laws § 7-1.2-1323 empowers the court to appoint a receiver, as well as to exercise the tools available pursuant to the

"full powers of a court of equity."  Second, if dissolution would be beneficial, the court can liquidate the assets and business.  R.I. Gen. Laws § 7-1.2-1314.  Third, if the entity is a close corporation, its foundational documents may provide for dissolution at the will of one or more shareholders or on the occurrence of a specified event.  R.I. Gen. Laws § 7-1.2-1701.  And fourth, if a disgruntled shareholder petitions for dissolution and either establishes that dissolution would be beneficial (§ 1314) or that, for a close corporation, there is a provision in the foundational documents of permitting dissolution (§ 1701), but other shareholders wish to avoid dissolution and buy-out the shares of the petitioning shareholder, the court can terminate the petitioning shareholder's rights as a shareholder and preside over the buy-out.  R.I. Gen. Laws § 7-1.2-1315.

It is clear that this case should travel the first path: that CBI's issues with deadlock and internal dissension are controlled by R.I. Gen. Laws § 7-1.2-1323,[33] which applies when (as here) "any of the grounds for liquidation" enumerated in § 1314 – e.g., deadlock, oppressive and fraudulent acts, corporate assets are at risk, and shareholder dissension threatens serious harm – are established, yet (as here) "liquidation would not be appropriate" (¶ 84 *supra*) and the foundational documents do not create any special rights to dissolution (¶ 37 *supra*).  To address these issues, § 1323 clothes the Court with "full power to appoint a receiver" and with "the full powers of a court of equity to make or enter any orders, injunctions, and decrees," as "justice and equity require."  R.I. Gen. Laws § 7-1.2-1323(2).  In directing the court to do "justice and equity," § 1323 specifically lists the buy-out statute as providing the court with a tool that may be deployed.  In short, Larkin is right that the determination of whether the Court should order a

---

[33] The relevant portion of R.I. Gen. Laws § 7-1.2-1323 is set out *supra* in note 20.

§ 1315 CBI buy-out and who should buy-out whom (Larkin buys-out the Gardners or *vice versa*) must be made in light of what is equitable and just pursuant to § 1323.

Examination of § 1315 itself confirms this conclusion. By its terms, the buy-out statute applies when a shareholder files a petition seeking dissolution clearly establishing the desire to terminate his or her status as a shareholder. As the Rhode Island Supreme Court has noted, it is typically used when a majority owner is accused by a minority owner of oppressive conduct. Hendrick, 755 A.2d at 790. Section 1315 benefits the parties by allowing the shareholders to avoid costly litigation over whether dissolution is appropriate; instead, the corporation's existence continues under the ownership of the purchasing party, the allegedly aggrieved investor is cashed out, and no finding of wrongdoing is made the by court. Marsh, 2007 WL 2344029, at * 4 (citing Douglas K. Moll, Shareholder Oppression and "Fair Value": Of Discounts, Dates, and Dastardly Deeds in the Close Corporation, 54 Duke L. J. 293, 369-70 (2004)); see Bogosian, 167 F. Supp. 2d at 498 (buy-out of minority by majority is appropriate remedy when minority owner has stopped working and there is shareholder dissension).

Consistent with this purpose, the unambiguous language of § 1315 provides that it is triggered by the filing of a "petition for dissolution" by "one or more shareholders." R.I. Gen. Laws § 7-1.2-1315. The statute provides that a qualifying petition must be grounded in one of two specific circumstances: "**either** § 7-1.2-1314 **or** a right to compel dissolution which is authorized under § 7-1.2-1701 or is otherwise valid." Id. (emphasis supplied). To qualify as a § 1314 petition, the aggrieved shareholder must not only allege the existence of a ground for liquidation (such as oppression), but also that dissolution would be beneficial. R.I. Gen. Laws § 7-1.2-1314. To qualify as a petition based on "a right to compel dissolution which is authorized under § 7-1.2-1701 or is otherwise valid," the aggrieved shareholder must seek dissolution

pursuant to R.I. Gen. Laws § 7-1.2-1701 or pursuant to another provision applicable to a close corporation that is "otherwise valid."  The meaning of the latter phrase ("otherwise valid") is derived from § 7-1.2-1701(a), which permits a close corporation to adopt articles, bylaws or agreements "**which would otherwise be invalid,**" permitting "one or more shareholders to dissolve the corporation at will or on the occurrence of a specified contingency."  R.I. Gen. Laws § 7-1.2-1701(a) (emphasis added).  Section 1701(a)(3) specifically adds that the "subsection [§ 7-1.2-1701(a)] does not invalidate any provision in [a close corporation's] articles of incorporation, bylaws, or agreements that would **otherwise be valid**."  R.I. Gen. Laws § 7-1.2-1701(a)(3) (emphasis supplied).

As applied by the Rhode Island Supreme Court, every case in which a buy-out has been ordered pursuant to § 1315 or its predecessor[34] is consistent with the language of the statute – all feature the filing of a petition unambiguously seeking dissolution.  Anjoorian v. Kilberg, 836 A.2d 1092, 1095 (R.I. 2003) (50% shareholder filed petition for dissolution, triggering right of other 50% shareholder to "avoid the dissolution by filing 'an election to purchase the shares'"); Hendrick, 755 A.2d at 787-88 (minority shareholder filed counterclaim seeking liquidation or buy-out pursuant to § 1315); DiLuglio v. Providence Auto Body, Inc., 755 A.2d. 757, 762-64 (R.I. 2000) (minority shareholder filed petition for dissolution; majority responded with election to buy-out); Shade v. Butler, 706 A.2d 1325, 1325-26 (R.I. 1998) (plaintiff filed for dissolution; in response, the defendant elected to purchase the plaintiff's shares); Charland v. Country View Golf Club, Inc., 588 A.2d 609, 609 (R.I. 1991) (minority shareholder petitioned to dissolve

---

[34] The pre-2004 cases were decided before the current version of § 1315 was enacted; they cite to § 1315's predecessor, R.I. Gen. Laws § 7-1.1-90.1, which is substantially the same.

corporation based on illegal conduct by majority; in response, corporation elected to purchase minority's shares).

By requiring an unambiguous dissolution petition, the Rhode Island Supreme Court's approach to § 1315 is straightforward and clear.  It does not create the risk of a trap for the unwary victim of oppression who wants to remain active in the business, see Diane Finkle, *et al.*, Attorney Practice Guide: Creditors' and Debtors' Rights, 56 R.I.B.J. 9, 10 (2008) ("[b]e aware of the election of shares remedy when considering commencement of a receivership petition by a shareholder in a shareholder dispute and the possible impact on the petitioning shareholder"), or, worse, provide a perverse incentive to wrongdoers, a danger that courts in other states have cautioned against.  See Graydog Internet, Inc. v. Giller, 406 P.3d 45, 56 (Or. 2017) (buy-out statute should not be interpreted to create incentive for majority shareholder committing wrongdoing to sue minority, forcing counterclaim to trigger buy-out as a way to "squeeze out a minority shareholder who wants to remain in the business").  For example, in Fedele v. Seybert, 250 A.D.2d 519 (N.Y. App. Div. 1998), the court reversed as an abuse of discretion a buy-out order entered in response to a minority shareholder's complaints of oppression and breach of fiduciary duty.  Id. at 523-24.  Where dissolution was only mentioned as alternative remedy in the minority shareholder's pleading, "[t]o permit the forced buy out of plaintiff's shares under these circumstances would offend rather than advance the goals underlying [the statutes] . . . where the plaintiff has made clear he does not want to dissolve the corporation, and requests that relief only alternatively."  Id.

Against this standard, it is clear that Larkin's CBI-based counterclaim is not a petition for dissolution – it complains of deadlock, oppression, lack of meetings, risk of loss of corporate assets and internal dissension, and mentions the risk of dissolution, ECF No. 41 ¶¶ 5, 41, but

expressly states that it is not a petition for dissolution, id. ¶ 66, and scrupulously eschews liquidation or dissolution in the prayer for relief.  See Fedele, 250 A.D.2d at 523-24 (complaint of oppression that mentions dissolution only as alternative remedy is not petition for dissolution). This conclusion is corroborated by a lens-shift to the two circumstances set out in § 1315.  First, Larkin's counterclaim is not a petition for dissolution pursuant to R.I. Gen. Laws § 7-1.2-1314 because it has not been established that "dissolution would be beneficial to the shareholders," which is a predicate for § 1314 dissolution.  See Quinn v. Yip, No. KC-2015-0272, 2015 WL 9234034, at *2-3 (R.I. Super. Ct. Dec. 11, 2015) (buy-out election is premature under § 1314 because plaintiff did not allege dissolution would be beneficial).  And, second, Larkin has not invoked a right to terminate either pursuant to R.I. Gen. Laws § 7-1.2-1701 or a dissolution right that is "otherwise valid" for a close corporation.

To buttress their argument that Larkin's counterclaim triggered an absolute and automatic buy-out right without regard to the equities, the Gardners rely on a Superior Court decision, Quinn, 2015 WL 9234034.  In Quinn, the court was addressing a suit brought by a 20% minority shareholder who appears to have served on the board for less than two weeks and not to have been active in the business.  Id. at *1.  The Quinn plaintiff complained of breach of fiduciary duty, demanded an accounting (for which purpose the court appointed a special master) and sought dissolution as "only a possible – not exclusive – remedy."  Id. at *2.  Overlooking the plain "either/or"[35] dichotomy established by the General Assembly when it crafted § 1315, Quinn considers three, not just two, circumstances to trigger a § 1315 right to elect to buy-out. Id. at *2-7.  Quinn's third circumstance derives from the statute's reference to a dissolution

---

[35] "Either/or" means an "unavoidable choice or exclusive division between **only two** alternatives."  Either-or, Merriam-Webster, available at, https://www.merriam-webster.com/dictionary/either-or (emphasis supplied).

petition that is "otherwise valid." Id. at *4. Specifically noting that the Rhode Island Supreme Court has not endorsed its approach and disregarding the linkage of "otherwise valid" to R.I. Gen. Laws § 7-1.2-1701, Quinn appears to hold that any pleading filed by a minority shareholder alleging oppression or any of the other § 1314 grounds for liquidation triggers a § 1315 buy-out right because such a pleading amounts to an "otherwise valid" petition for dissolution even though dissolution is not the remedy sought. Id. at *4-7.

The Gardners invoke Quinn for the proposition that when the 50% shareholders commit wrongful acts and sue the active-in-the-business owner of the other 50%, forcing him to counterclaim, *inter alia*, alleging oppression, the wrongdoer can finish off the freeze-out by forcing an unwanted buy-out. As the Gardners read Quinn, a § 1315 election bars the Court from further examination of the inequities of such a holding in a circumstance like that faced by Larkin in this case. They contend that Larkin's counterclaim alleging deadlock and oppression, which was triggered by the Gardners' filing of the breach of contract complaint based on the "Ownership Agreement," allows them to marshal § 1315 to achieve a palpably inequitable result.

In reliance on the plain language of § 1315 and the Rhode Island Supreme Court's many cases interpreting it, I decline to adopt the Gardners' interpretation of Quinn's seemingly expansive view of "otherwise valid" as a third type of petition for dissolution (one that does not seek dissolution), leading to a forced buy-out despite the inequity of the result.[36] Ironically, this

---

[36] In rejecting the Gardners' reliance on this aspect of a Superior Court decision, I am mindful that, as a federal court exercising diversity jurisdiction, this Court must apply state law as set out in Rhode Island's statutes and in the interpretations of the Rhode Island Supreme Court. See Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co., 138 S. Ct. 1865, 1874 (2018); see West v. Am. Telephone & Telegraph Co., 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law."). In Rhode Island, this Court may consider Superior Court decisions in light of the guidance of the Rhode Island Supreme Court, which has held that they "are neither binding[,] . . . nor do they establish precedent." Impulse Packaging, Inc. v. Sicajan, 869 A.2d 593, 600 n.14 (R.I. 2005). Further, I am mindful that the federal court should be hesitant to blaze new state law trails previously uncharted by the Rhode Island Supreme Court, as this aspect of Quinn does. In re Dial Complete Mktg. & Sales Practices Litig., 320 F.R.D. 326, 328 n.1 (D.N.H. 2017).

interpretation of <u>Quinn</u> is contradicted by <u>Quinn</u> itself, which endorses the importance of doing

equity by its overt reliance on principles developed in interpretations of the New York buy-out

statute, as well as on the Model Business Corporation Act. Both of these sources specifically

reject an interpretation that leads to an inequitable outcome. See <u>Fedele</u>, 250 A.D.2d at 523-24

(rejecting inequitable interpretation of buy-out statute that would bar shareholder who is active in

business from complaining of oppression except at risk of losing his shares); A.B.A. Model

Business Corporation Act, 4th Edition, Chapter 14, § 14.34(a) ("In a proceeding . . . to dissolve a

corporation, . . . one or more shareholders may elect to purchase all shares owned by the

petitioning shareholder. . . . **An election pursuant to this section shall be irrevocable unless**

**the court determines that it is equitable to set aside or modify the election**.") (emphasis

supplied). Thus, <u>Quinn</u>'s emphasis on equity is compatible with Rhode Island's statutory

scheme, which provides that a colorable complaint of oppression triggers the court's full powers

of equity, including the power to order an involuntary buy-out if consistent with "justice and

equity." R.I. Gen. Laws § 7-1.2-1323.

What the Court faces in this case is profoundly different from <u>Quinn</u>. Larkin is not a

disengaged minority investor. He is not only the owner of 50% of CBI's shares, but also is a

virtual founder of CBI in that, until frozen out, his sales skills and business contacts were

primarily responsible for the transformation of CBI from an empty shell into a viable business.

It would be perverse indeed if Rhode Island law barred him from responding to the Gardners'

questionable breach of contract claim (based on the "Ownership Agreement") by raising their

"illegal, oppressive, [and] fraudulent conduct," R.I. Gen. Laws § 7-1.2-1314, in his counterclaim

except at the risk of losing forever his ownership interest in the corporation that he built. Finding

that Rhode Island law does not dictate such a result, I also find that Larkin is likely to succeed on the merits of Count VII as to CBI.

**B.**      **Irreparable Harm and the Public Interest**

In considering harm, a motion for appointment of a receiver *pendente lite* requires the Court to assess whether the property is in imminent danger; whether the plaintiff's interest in the property might be susceptible to irreparable injury; whether available legal remedies are adequate; whether the harm to the plaintiff caused by the denial of appointment would exceed the harm to the defendant and others opposed to the appointment; and whether the interest of the plaintiff and others sought to be protected will be well served by the receivership. Consol. Rail Corp., 861 F.2d at 326-27. Similarly, a motion for preliminary injunction requires the Court to consider "the prospect of irreparable harm absent the injunction, [and] the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)," as well as the impact on the public interest. Rosario-Urdaz, 350 F.3d at 221.

Based on the facts developed over the course of this proceeding, I find that the evidence demonstrates significant risk that, without a receiver *pendente lite* and a preliminary injunction, irreparable harm will be inflicted on Larkin, CBI and CBWM, as well as that the recommended receivership will well serve the interests of all parties, including that the adverse impact on the Gardners of the interventions that I am recommending is not substantial. ¶¶ 81-83, 85-89 *supra*. Therefore, the irreparable harm analysis leans decisively towards both the appointment of a receiver *pendente lite* and a preliminary injunction. Relatedly, the evidence also demonstrates that the public interest would be served by an injunction. See ¶ 90 *supra*.

For himself, Larkin has established that he is suffering irreparable harm that the payment of money damages at the end of this case cannot rectify. As an individual who needs his salary to support his family, Larkin abandoned other business endeavors and dedicated his time, sales skills and industry contacts to building CBI's business; fundamental to his investment was the proposition that he would actively participate in CBI's business as the leader of marketing and sales and that he would earn a salary in the agreed-upon range. Pivotal to Larkin's decision to become an owner of CBI and CBWM was the understanding and agreement with the Gardners that his business skills would complement the Gardners' skills in running a manufacturing facility, thereby addressing the underperformance that plagued the operations of Oldco when run by the Gardner family alone. The Gardners' actions have left Larkin potentially unable to work on corporate opportunities in the regional window industry due to his ongoing fiduciary obligations to CBI and CBWM (¶ 88 *supra*; Ex. 11), at the same time that his shares in CBI and his membership interest in CBWM are valueless. His business reputation is in tatters and his industry network, rallied to support CBI, is tapped out, yet he has been barred from any role in the business to which he dedicated these resources and is totally cut off from receiving any return. See Wilkes, 353 N.E. at 664 ("[C]utting off of [plaintiff's] salary, together with the fact that the corporation never declared a dividend[,] . . . assured that [plaintiff] would receive no return at all from the corporation."). And he is at risk that the fraudulently procured Third Note will be called, leaving him owning 50% of a limited liability company (CBWM) that is an empty shell.

Both Companies face serious risk of harm unless the Court intervenes. Both have been deprived of Larkin's sales skills. Both have been unable to hire legal counsel. Until the Court appointed the Special Master, May 17 Order; ECF No. 121, neither was able to hold meetings,

including the meetings required by their respective organizing documents. Due to the Gardners' ongoing challenge with maintaining adequate financial controls, both face ongoing financial risk. And because of the Larkin/Gardner dissension, the court-ordered meetings (as the Court strived to protect the *status quo* with a less draconian remedy) failed, making clear that a more aggressive intervention is necessary.

As to CBWM, it has been unable to select new managers, leaving it stuck – potentially in perpetuity – with the "Initial Managers" named in its formative document. Due to the fraudulent procurement and subsequent default of the Third Note, CBWM is potentially at risk that the entire principal ($900,000) could be called, permitting the Gardners to claw back its assets, at the same time that the Third Note is a non-performing obligation carried on CBWM's books, potentially impacting banking relationships.

As to CBI, despite his illegal and oppressive actions, it has been unable to select new officers and is stuck with Johnny Gardner as its president, secretary and treasurer, performing the functions of its board of directors. Due to Johnny Gardner's illegal action in depriving Larkin of access to CBI's books and records in violation of R.I. Gen. Laws § 7-1.2-1502(c), it is exposed to a substantial fine that could adversely impact its operations. And it is indirectly exposed to the risk of the Third Note because of its reliance on CBWM for products sold.

Fundamental to my recommendations is the now established fact (¶ 65 *supra*) that the less draconian interventions adopted by the Court in <u>Gardner III</u> were insufficient to address these concerns. At bottom, I find that the evidence of irreparable harm supports a preliminary injunction that brings Larkin back into the active operations of the business, that removes the Gardners (and Larkin) from control and that, at least while this case is pending, puts control of

operations into the hands of a receiver *pendente lite* pursuant to the federal standard set in

Consol. Rail Corp., 861 F.2d at 326-27, guided by R.I. Gen. Laws § 7-1.2-1323.

## V.    RECOMMENDATIONS[37]

Based on the foregoing, including Larkin's strong likelihood of success on the merits of

all of his substantive claims and the irreparable harm to him and the Companies without an

injunction, as contrasted to the lesser hardship to the Gardners that an injunction will cause, as

well as the public interest, I recommend that the Court grant Larkin's motion for a preliminary

injunction mandating that Larkin be reinstated by both CBI and CBWM, at an initial salary of

$2000 per week[38] paid by each of the Companies based on the *status quo ante* (¶ 72 *supra*), with

benefits[39] consistent with those afforded to the Gardners; that the Gardner III injunction order

mandating that Larkin's health insurance be restored and that his rights of access to the books

and records of the Companies be respected shall continue for the duration of the litigation; that

Larkin and the Gardners shall be enjoined from acting as officers of CBI or managers of CBWM;

and that the Gardners shall be enjoined from taking any action to enforce the Third Note or to

assign the Third Note to any other person or entity.[40]  To the extent that the November 26, 2019,

---

[37] With minor differences, these recommendations are largely modeled on what the Special Master/Receiver proposed in Report III.  And while I do not suggest that these recommendations may be entered on consent, as noted *supra*, the parties acquiesced to many of the Special Master/Receiver's proposals in their responses to Report III.

[38] My recommendation is that Larkin's salary paid by CBI and CBWM shall begin to accrue effective upon the issuance of this report and recommendation, subject to the adoption of it by the District Court, at which time all accrued amounts shall be promptly paid.  Larkin has urged me to recommend that the injunction include an award of back pay retroactive to the filing of the Emergency Motion on May 6, 2019.  Because such an award effectively amounts to money damages, I decline include it as part of the recommended interim injunction.  Further, this recommendation that Larkin be paid his full salary by each Company is intended to replace, not supplement, the payment stream that was ordered by Gardner III, 2019 WL 6337686, at *5.

[39] I do not make any recommendation regarding which of the Companies must provide the benefits, but rather that benefits analogous to those made available to the Gardners must be made available to Larkin.

[40] The Emergency Motion has been pending since May 6, 2019, during which period the Gardners have been in control and Larkin has been frozen out as the Court attempted to implement lesser interventions.  Therefore, one might argue that the recommended injunction is mandatory in nature and not merely a restoration of the *status quo ante*.  To the extent such a characterization is a better reflection of what I am recommending, I find that the facts and

Order required weekly meetings (ECF No. 121), it should be vacated and such meetings may continue or not as the Receiver *pendente lite* shall in his discretion determine.

Based on the same factors (the merits and the balancing of the harms), as well as on the colorable allegation of fraud on the part of the Gardners in procuring the Third Note, which places CBWM's property in imminent danger, on the deadlock of the Companies and on the illegal, oppressive and fraudulent actions of the Gardners, pursuant to <u>Consol. Rail Corp.</u>, 861 F.2d at 326-27, and guided by R.I. Gen. Laws § 7-1.2-1323, I further recommend that the Court grant Larkin's motion for appointment of a receiver *pendente lite* and appoint Theodore Orson, Esq., as the Receiver *pendente lite* of CBI and CBWM, pursuant to the terms previously established by the Court, including with respect to *ex parte* contact and the preservation of the attorney client privilege. May 17 Order ¶¶ 14-16; October 31 Order at 3-4. I recommend that he be directed to file a bond in the amount of $10,000 with surety authorized to do business in Rhode Island conditioned on his well and true performance of the duties of the office.[41] Such bond shall be filed within ten days of the District Court's adoption of this recommendation. By contrast with the more limited powers conferred on him in the October 31 Order ¶¶ 1-3, in accordance with the instructions set forth below, the Receiver *pendente lite* shall assume the power to actually manage and operate CBI and CBWM and to replace their officers and members respectively for the period while this litigation is pending or until the owner deadlock is resolved. Nevertheless, this receivership appointment is specifically cabined to reflect that its purpose is to continue to facilitate the maintenance of the *status quo ante* and the ongoing viable

---

the law so clearly favor Larkin as to justify a mandatory preliminary injunction. <u>See</u> <u>Robinson</u>, 2013 WL 4039027, at *2.

[41] Upon the filing of this bond, the earlier bond given in compliance with the October 31 Order may be released.

operations of CBI and CBWM during the period when the owners are deadlocked and internal dissension is adversely impacting operations and only until the conclusion of this litigation.[42]

The Receiver *pendente lite*'s initial instructions are set forth below:

1.      In his discretion, as needed to perform his duties, the Receiver *pendente lite* shall continue to use the Financial Consultant, whose engagement was previously approved by Text Order of October 31, 2019.

2.      Using the method outlined in Report III, ¶¶ 63-64, the Receiver *pendente lite* shall promptly engage a chief executive officer (the "CEO") on behalf of both Companies to manage and operate them, including to deal with their legal and fiduciary obligations (such as legal representation in this litigation) as the Receiver *pendente lite* or the CEO may deem necessary and appropriate in light of the temporary nature of the receivership.  The CEO shall report to the Receiver *pendente lite* with respect to the CEO's responsibilities as set forth below and with respect to such other duties and responsibilities as the Receiver *pendente lite* shall direct.

3.      The CEO shall implement the reinstatement of Larkin as an employee of CBI as the senior middle-manager in the position of "Sales Manager" of all CBI locations, and as an employee of CBWM in the position of "Sales Agent."  Upon reinstatement as "Sales Manager" of CBI, Larkin shall report directly to the CEO.  Upon reinstatement as "Sales Agent" of CBWM, Larkin shall report to whomever the CEO may direct.  Consistent with the need to develop a transition plan and to address that plan with other employees, the CEO shall determine

---

[42] To be clear, I do not recommend that the Court instruct the Receiver *pendente lite* to take possession of the property of the Companies or give notice to creditors as would be appropriate if this case had been filed for the purpose of liquidation, dissolution or sale of the Companies.  In the event that such circumstances arise, the Receiver *pendente lite* may seek further instructions.

the date on which Larkin will return to work at CBI and CBWM and shall determine the location of his office and the allocation of his time between CBI and CBWM.

4.  The CEO shall implement the removal of Johnny Gardner as an officer of CBI and shall transition him to employment solely at CBWM so that he has no further responsibilities at CBI when Larkin resumes active employment for CBI. The CEO shall set the initial salaries for each of the Gardners (Johnny, David and John Sr.) at $2000 per week paid by CBWM based on the *status quo ante* (¶ 72 *supra*), with retention of existing benefits. The CEO, in consultation with the Gardners, shall determine the job descriptions for each of the Gardners at CBWM and determine which of them reports directly to the CEO.

5.  The CEO shall determine what marketing model to use for CBI and may transition to whatever plan the CEO believes to be prudent and in the best interest of CBI.

6.  Under the supervision of the Receiver *pendente lite*, with assistance from the Financial Consultant and consistent with the recommendations in Report III, ¶¶ 38-39, 52-53, the CEO shall focus on improving the financial practices of CBI and CBWM, which shall include the development of forecasts and monthly reports as directed by the Receiver *pendente lite* and the oversight of the check book and accounting methods, including intercompany accounts, and may include the replacement of staff as the CEO may determine to be in the interest of CBI and CBWM. Also, under the supervision of the Receiver *pendente lite*, the CEO shall discharge the obligation of the Companies to provide access to their books and records to all owners.

7.  If, at any time, the CEO (or the Receiver *pendente lite* or his Financial Consultant) determines that either CBI or CBWM will not be able to pay its obligations as and when they become due in the ordinary course, the CEO shall notify the Receiver *pendente lite*, and the Receiver shall file a petition for instructions recommending next steps.

8.     The CEO is authorized to make senior level business and strategic decisions regarding CBI and CBWM, including without limitation the hiring and firing of employees (consistent with any contractual obligations) and the appropriate use of offices.  The CEO is further authorized to enter into contracts on behalf of CBI and CBWM, or to delegate the authority to do so to Larkin, the Gardners or any employee or agent of CBI and CBWM.  In making all such decisions, including with respect to contracting authority, the CEO shall consult with the Gardners and Larkin, and with the Receiver *pendente lite* and/or his Financial Consultant as the Receiver *pendente lite* may deem appropriate.  The CEO is specifically authorized to determine whether Larkin's reinstatement or Johnny Gardner's transfer to CBWM makes any other employee expendable and to terminate or modify the employment, mindful of any contractual commitments and applicable law.

9.     With respect to Larkin and the Gardners, if any of them refuses to abide by decisions made by the CEO regarding CBI or CBWM, the CEO is authorized to terminate that individual's employment.

10.     If the CEO determines that it would be in the business interest of CBI or CBWM to terminate Larkin or to terminate one or more of the Gardners from one or both of the Companies, and that the business interest of the respective Company cannot reasonably be achieved in a way that does not adversely impact the reasonable expectations of an owner to continued employment, the CEO is authorized to do so.  Relatedly, to the extent that the CEO determines that Larkin or any of the Gardners are not providing sufficient value to CBI or to CBWM to justify their initial salaries or that it would be prudent to reduce any owner's salary based on the needs of the business of CBI and CBWM, including cash flow (which shall include consideration of the costs associated with the engagement of the CEO and the cost of the

Receiver *pendente lite* and the Financial Consultant), the CEO is empowered to do so. If the CEO takes any of these actions, he or she is authorized immediately to reassess the manner in which CBI and CBWM allocate profits to their shareholders/members and, after taking direction from the Receiver *pendente lite*, based on the interests of the Companies and on the reasonable expectations of the owners, may establish an entirely different approach, which may include payment of salaries solely based on the value of services rendered with periodic distributions to owners as appropriate.

11.     The Receiver *pendente lite* shall continue to act as custodian of the Third Note and shall continue to have the power to take actions sufficient to protect CBWM from enforcement of the Third Note.[43]

12.     To the extent that the Receiver *pendente lite* concludes that a business valuation to determine the relative values of CBI and CBWM is necessary to facilitate the business interests of CBI and CBWM, including without limitation their interests in this litigation, he is specifically authorized to engage an expert for that purpose, following consultation with Larkin and the Gardners.

## VI.     CONCLUSION

Based on the foregoing, I recommend that the Emergency Motion (ECF No. 18) be granted in part and denied in part; that the Court enter a preliminary injunction as set forth above; and that the Court appoint Theodore Orson, Esq, as Receiver *pendente lite* subject to the terms, limitations and instructions set forth above.

---

[43] The Receiver *pendente lite* is not instructed to bring a legal action to declare that the Third Note is unenforceable against CBWM. If the Receiver forms the judgment that CBWM should engage counsel for that purpose, he may return to the Court for further instructions. October 31 Order ¶ 8, n.8.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).

<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
February 20, 2020